104 F.3d 1507
 43 ERC 1946, 144 A.L.R. Fed. 669, 65
USLW 2479,
27 Envtl. L. Rep. 20,508,
97 Cal. Daily Op. Serv. 420,
97 Daily Journal D.A.R. 673
 STATE OF CALIFORNIA, Plaintiff-Appellant,
v.
MONTROSE CHEMICAL CORPORATION OF CALIFORNIA; PCB
Industrial, Defendants-Appellees,
Chris-Craft Industries, Inc.; Stauffer Management Company;
ICI American Holdings, Inc.; Atkemix Thirty-Seven, Inc.;
Rhone-Poulenc Basic Chemicals Company,
Defendants-counter-claimants-cross-claimants-Appellees.
(Two Cases).
UNITED STATES of America, Plaintiff-Appellant,
v.
MONTROSE CHEMICAL CORPORATION OF CALIFORNIA; PCB
Industrial, Defendants-Appellees,
Chris-Craft Industries, Inc.; Stauffer Management Company;
ICI American Holdings, Inc.; Atkemix Thirty-Seven, Inc.;
Rhone-Poulenc Basic Chemicals Company,
Defendants-counter-claimants-cross-claimants-Appellees.
 Nos. 95-55725, 95-55736.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 8, 1996.
Decided Jan. 17, 1997.
 
 John Saurenman, Deputy Attorney General, Los Angeles, CA, and Edward J. Shawaker, United States Department of Justice, Washington, DC, for plaintiffs-appellants.
 Karl S. Lytz, Kristine L. Wilkes, Kimberly M. McCormick, Latham & Watkins, San Diego, CA, Paul B. Galvani, Ropes & Gray, Boston, MA, Frank Rothman and Jose R. Allen, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, CA, Charles B. Cohler and David M. Rosenberg-Wohl, Lasky, Haas & Cohler, San Francisco, CA, for defendants-appellees and defendants-counter-claimants-cross-claimants-appellees.
 Tom Udall, Attorney General of New Mexico, Charles DeSaillan, Assistant Attorney General, for Natural Resources, Office of the Attorney General, Environmental Enforcement Division, Santa Fe, NM, for the State of New Mexico.
 Scott Harshbarger, Attorney General of Massachusetts, Karen McGuire, Assistant Attorney General, Environmental Protection Division, Boston, MA, for the Commonwealth of Massachusetts.
 Hubert H. Humphrey, III, Attorney General of Minnesota, Stephen Shakman, Assistant Attorney General, St. Paul, MN, for the State of Minnesota.
 Joseph P. Mazurek, Attorney General of Montana, Clay Smith, Solicitor, Robert G. Collins, Candace West, Charles E. Magraw, Assistant Attorneys General, Natural Resource Damage Litigation Program, Helena, MT, for the State of Montana.
 Frankie Sue Del Papa, Attorney General of Nevada, William Frey, Assistant Attorney General, Carson City, NV, for the State of Nevada.
 Bruce M. Botelho, Attorney General of Alaska, Marie Sansone, Robert K. Reges, Assistant Attorneys General, Natural Resources Section--Juneau, Alaska Department of Law, Juneau, AK, for the State of Alaska.
 Grant Woods, Attorney General of Arizona, Phoenix, AZ, for the State of Arizona.
 Winston Bryant, Attorney General of Arkansas, Charles L. Moulton, Assistant Attorney General, Little Rock, AR, for the State of Arkansas.
 Richard Blumenthal, Attorney General of Connecticut, Brian J. Comerford, Assistant Attorney General, Office of the Attorney General, Hartford, CT, Alan G. Lance, Attorney General of Idaho, Clive J. Strong, Deputy Attorney General, Boise, ID, Deborah T. Poritz, Attorney General of New Jersey, Anthony T. Drollas, Jr., Deputy Attorney General, Trenton, NJ, for the State of New Jersey.
 Jeffrey B. Pine, Attorney General of Rhode Island, Michael Rubin, Assistant Attorney General and Environmental Advocate, Office of the Attorney General, Providence, RI, for the State of Rhode Island.
 Jan Graham, Attorney General of Utah, Salt Lake City, UT, for the State of Utah.
 Jeffrey L. Amestoy, Attorney General of Vermont, Conrad W. Smith, Assistant Attorney General, Montpelier, VT, for the State of Vermont.
 Appeals from the United States District Court for the Central District of California, A. Andrew Hauk, District Judge, Presiding. D.C. No. CV-90-03122-AAH.
 Before BRIGHT,* SKOPIL, and WIGGINS, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 This action was filed by the United States and the State of California ("the Trustees") in 1990 under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), as part of an effort to clean up DDT and PCBs released respectively by Montrose Chemical Corporation and Westinghouse Electric Corporation. The release over several decades of an estimated 5,500,000 pounds of DDT and 38,000 pounds of PCBs has allegedly harmed the marine environment in the San Pedro Channel, the Palos Verde Shelf, the Los Angeles-Long Beach Harbors and the area surrounding Santa Catalina Island and the Channel Islands.
 
 
 2
 In this action, the Trustees seek to recover (1) natural resource damages under 42 U.S.C. § 9607(a)(4)(C) for the harm to the marine environment caused by releases of DDT and PCBs and (2) response costs under 42 U.S.C. § 9607(a)(4) for the clean-up of the Montrose DDT plant site. The district court granted summary judgment as to the claim for natural resource damages on the ground that the claim was barred by CERCLA's statute of limitations, 42 U.S.C. § 9613(g). The district court also ruled that the Montrose defendants' collective liability for damages on the natural resource damages claim was capped at $50 million plus response costs under 42 U.S.C. § 9607(c)(1).
 
 
 3
 The Trustees appeal both orders,[1] arguing that the district court misinterpreted CERCLA's statute of limitations as well as the liability cap. The Trustees also argue this case should be reassigned upon remand, due to the district judge's conduct at the March 22, 1995 hearing on the defendants' motions. For the following reasons, we REVERSE and REMAND to the district court. We decline to reassign this case upon remand.
 
 I.
 
 4
 Montrose operated a DDT manufacturing plant in Torrance, California, from 1947 through 1982, and during that time allegedly released DDT into the environment through ocean dumping, discharge into the sewer collection system, surface water runoff into the Los Angeles/Long Beach Harbors and aerial dispersal of waste from the manufacturing operation. Westinghouse Electric Corporation operated an electrical transmission equipment maintenance and repair plant in Los Angeles from approximately 1958 until recently. During this time, Westinghouse allegedly released PCBs into the marine environment through discharge into the sewer collection system and, from there, into the San Pedro Channel.
 
 
 5
 The Trustees filed this action in 1990, seeking to recover damages for harm to the marine environment from Westinghouse and from Montrose and its successor corporations, Chris-Craft Industries, Inc., Stauffer Management Company, ICI American Holdings, Inc., Atkemix Thirty-seven, Inc. and Rhone-Poulenc Basic Chemicals Company (collectively "the Montrose defendants").
 
 
 6
 The Montrose defendants and Westinghouse filed a motion for partial summary judgment on May 10, 1993 based on CERCLA's statute of limitations. The special master denied this motion. The district court, reviewing the special master's ruling de novo, granted the motion after a hearing on March 22, 1995. The district court held that under the second prong of 42 U.S.C. § 9613(g)(1), the statute of limitations began running on August 1, 1986, the date on which the Department of Interior ("DOI") promulgated final regulations under § 9651(c) setting forth alternative protocols for conducting assessments of natural resource damage ("Type B regulations"). The court rejected the Trustees' argument that the statute began running, at the earliest, on March 20, 1987, the date on which DOI promulgated final regulations under § 9651(c) setting forth standard procedures for simplified assessments of natural resource damage for certain environments ("Type A regulations"). The court also held that the Trustee agencies "discovered" the loss and its connection to the release of DDT from the Montrose defendants' facility and the release of PCBs from the Westinghouse plant more than 3 years prior to the filing of this action.
 
 
 7
 In addition, the Montrose defendants filed a motion in limine on February 24, 1993, requesting the court to limit their collective damages to $50 million plus response costs under 42 U.S.C. § 9607(c)(1)(D). The special master initially denied the motion. On October 18, 1993, the district court reviewed the recommendation de novo, and expressed doubts concerning the special master's ruling. The court ordered the special master to reconsider the issue in light of the court's statements at the hearing.
 
 
 8
 The special master's second recommendation granted the Montrose defendants' motion in part, and denied it in part. Again, the Montrose defendants objected to the ruling and the court held another hearing on January 6, 1995 to review the motion once again. At the hearing, the court agreed with the Montrose defendants' position and stated that the defendants should submit a written order for the court's consideration. The parties could not agree on a proposed order; the court therefore heard further argument on the liability cap issue on March 22, 1995. At the March 22 hearing the court granted the defendants' motion and entered a written order to that effect. In that order, the district court held that "[p]ursuant to 42 U.S.C. § 9607(c)(1)(D), and based on the allegations in Plaintiffs' Complaint, the Montrose defendants' collective maximum liability for 'damages' on Claim One is 'the total of all costs of response plus $50,000,000.' "
 
 
 9
 Although the court did not explain its reasoning in its written order, at the January 6, 1995 hearing the court stated two bases for this holding: (1) all the releases by the Montrose facility over the entire time period alleged in the complaint constituted one "incident involving release" under the statute; and (2) the Montrose site was one "facility" and therefore the statute applied a $50 million cap for all releases from the Montrose facility.
 
 
 10
 The Trustees timely appeal both decisions of the district court.
 
 II.
 
 11
 We review the district court's interpretation of CERCLA de novo. State of Idaho v. Howmet Turbine Component Co., 814 F.2d 1376, 1378 (9th Cir.1987). We review the district court's grant of summary judgment on the statute of limitations issue de novo, determining if, viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact and whether the district court correctly applied the substantive law. City of Vernon v. Southern Cal. Edison Co., 955 F.2d 1361, 1365 (9th Cir.), cert. denied, 506 U.S. 908, 113 S.Ct. 305, 121 L.Ed.2d 228 (1992).
 
 III.
 
 12
 The Trustees contend that the district court erred in holding that CERCLA's statute of limitations, 42 U.S.C. § 9613(g)(1), barred the Trustees' first claim for natural resource damage under 42 U.S.C. § 9607(f)(1). For the following reasons, we conclude the Trustees are correct.
 
 
 13
 To begin, 42 U.S.C. § 9613(g)(1) provides:
 
 
 14
 (1) Actions for natural resource damages
 
 
 15
 Except as provided in paragraphs (3) and (4), no action may be commenced for damages (as defined in section 9601(6) of this title) under this chapter, unless that action is commenced within 3 years after the later of the following:
 
 
 16
 (A) The date of discovery of the loss and its connection with the release in question.
 
 
 17
 (B) The date on which regulations are promulgated under section 9651(c) of this title.
 
 
 18
 42 U.S.C. § 9613(g)(1) (1995) (emphasis supplied).
 
 
 19
 Accordingly, under § 9613(g)(1) the statute of limitations begins to run when the later of two events occurs: (1) the date of discovery of the loss in question or (2) the date on which regulations are promulgated under § 9651(c). The district court held that under the second prong of § 9613(g)(1), the statute began to run on August 1, 1986, the date on which the DOI promulgated final Type B regulations under § 9651(c). The court also held that the Trustee agencies "discovered" the loss and its connection to the release of DDT from the Montrose defendants' facility and the release of PCBs from the Westinghouse plant more than 3 years prior to the filing of this action. Because we hold that this action was timely filed under the regulations prong of the statute of limitations, we only address that prong.
 
 A.
 
 20
 The Trustees argue that the district court erred in its interpretation of the second prong of § 9613(g)(1) by holding that the statute began to run on August 1, 1986 when DOI promulgated Type B regulations under § 9651(c). The Trustees contend that the plain language of § 9651(c) requires two types of regulations, Type A and Type B; therefore, they argue, "[t]he date on which regulations are promulgated under section 9651(c) of this title" should be interpreted to mean the date on which both sets of regulations required by § 9651(c) were promulgated. For the following reasons, we agree.
 
 
 21
 To begin, "[i]n construing statutes in a case of first impression, we first look to the language of the controlling statutes, and second to legislative history." Central Montana Elec. Power Co-op., Inc. v. Administrator of Bonneville Power Admin., 840 F.2d 1472, 1477 (9th Cir.1988) (citation omitted). "[I]f the language of a statute is clear and there is no ambiguity, then there is no need to 'interpret' the language by resorting to the legislative history or other extrinsic aids." Church of Scientology v. U.S. Dept. of Justice, 612 F.2d 417, 421 (9th Cir.1979).[2] Moreover, "[a]bsent a clearly expressed legislative intent to the contrary, the plain language must ordinarily be regarded as conclusive." Central Montana Elec., 840 F.2d at 1477 (citation omitted). Lastly, statutes of limitations are to be strictly construed in favor of the government. United States v. Dos Cabezas Corp., 995 F.2d 1486, 1489 (9th Cir.1993).
 
 
 22
 Here, the language of sections 9613(g)(1)(B) and 9651(c) is not ambiguous. As noted above, § 9613(g)(1)(B) provides for the statute of limitations to begin running on "[t]he date on which regulations are promulgated under section 9651(c) of this title." 42 U.S.C. § 9613(g)(1)(B). Section 9651(c), in turn, provides:
 
 
 23
 (c) Regulations respecting assessment of damages to natural resources
 
 
 24
 (1) The President, acting through Federal officials designated by the National Contingency Plan published under section 9605 of this title, shall study and, not later than two years after December 11, 1980, shall promulgate regulations for the assessment of damages for injury to, destruction of, or loss of natural resources resulting from a release of oil or a hazardous substance for the purposes of this chapter and section 1321(f)(4) and (5) of Title 33. Notwithstanding the failure of the President to promulgate the regulations required under this subsection on the required date, the President shall promulgate such regulations not later than 6 months after October 17, 1986.
 
 
 25
 (2) Such regulations shall specify (A) standard procedures for simplified assessments requiring minimal field observation, including establishing measures of damages based on units of discharge or release or units of affected area, and (B) alternative protocols for conducting assessments in individual cases to determine the type and extent of short- and long-term injury, destruction, or loss. Such regulations shall identify the best available procedures to determine such damages, including both direct and indirect injury, destruction, or loss and shall take into consideration factors including, but not limited to replacement value, use value, and ability of the ecosystem or resource to recover.
 
 
 26
 (3) Such regulations shall be reviewed and revised as appropriate every two years.
 
 
 27
 42 U.S.C. § 9651(c) (1995) (emphasis supplied).
 
 
 28
 Thus, the plain language of § 9651(c) requires the President to promulgate "regulations for the assessment of damages" for injury to natural resources. 42 U.S.C. § 9651(c)(1). The section also specifies that "such regulations" shall include both standard procedures for simplified assessments ("Type A") and alternative protocols for conducting assessments ("Type B"). 42 U.S.C. § 9651(c)(2) (1995). The plain meaning of the term "regulations" in § 9651(c) therefore encompasses both Type A and Type B regulations.
 
 
 29
 Accordingly, the phrase in § 9613(g)(1)(B) that triggers the statute of limitations on "the date on which regulations are promulgated under § 9651(c)" should also be interpreted as referring to "regulations" as used by § 9651(c)--including both Type A and Type B regulations. Section 9613(g)(1)(B) does not limit the term "regulations" to only those regulations required by § 9651(c)(2)(B) (requiring Type B regulations); to the contrary, § 9613(g)(1)(B) refers to the promulgation of regulations under § 9651(c) as a whole. Thus, the only reasonable interpretation of § 9613(g)(1)(B) is that the statute of limitations begins to run once all regulations required by § 9651(c) are promulgated.
 
 
 30
 Here, a portion of the regulations required by § 9651(c), the Type B regulations, were promulgated on August 1, 1986. See 51 Fed.Reg. 27,674, August 1, 1986. The Type A regulations were promulgated in final form on March 20, 1987--thus completing the promulgation of "regulations" under § 9651(c) and triggering the running of the statute of limitations under § 9613(g)(1)(B). See 52 Fed.Reg. 9042, March 20, 1987.[3]
 
 
 31
 We hold therefore that the plain language of sections 9651(c) and 9613(g)(1) permits the filing of a lawsuit for recovery for natural resource damage within three years of the promulgation of both Type A and Type B regulations under § 9651(c). Thus, here, the action by federal and state trustees was timely.
 
 B.
 
 32
 Montrose, however, argues that the language of the above sections is ambiguous and therefore we must look to the legislative history of the statute to discern Congress' intent in passing the statute of limitations. For the following reasons, we reject this argument.
 
 
 33
 If the plain meaning of the statute only supports one interpretation, the statute is not ambiguous. See Queen of Angels/Hollywood Presbyterian Medical Center v. Shalala, 65 F.3d 1472, 1477 (9th Cir.1995) (concluding that the clear language of a statute only supported one interpretation and thus was not ambiguous). Here, Montrose offers no other interpretation of the specific language of § 9613(g) or § 9651(c) that reasonably accounts for the fact that § 9651(c)(2) uses regulations to include both Type A and Type B regulations.[4] Instead, Montrose claims that the government itself demonstrates the ambiguity of these sections by suggesting three different dates upon which the statute of limitations began or would begin to run: (1) March 20, 1987 when the Type A regulations for coastal regions were promulgated; (2) the date on which the regulations are revised and promulgated in final form pursuant to Ohio v. U.S. Dept. of Interior, 880 F.2d 432 (D.C.Cir.1989), and Colorado v. U.S. Dept. of Interior, 880 F.2d 481 (D.C.Cir.1989); see 43 C.F.R. 11.91(e) (1994); and finally, (3) on the date when Type A regulations are promulgated for all environments--a date yet to be determined.
 
 
 34
 These proffered interpretations, however, do not render the statutory language of § 9613(g) ambiguous for the purpose of the issue presented in this case: whether § 9613(g)(1)(B) requires that both Type A and B regulations be promulgated in order to start the statute of limitations running. Instead, Montrose focuses on an ambiguity in § 9613(g) concerning when the statute begins to run if the regulations are promulgated in final form but then are subsequently invalidated by a court as contrary to the statute.[5] Thus, rather than pointing to an ambiguity concerning the meaning of "regulations," Montrose points to an ambiguity in § 9613(g) concerning what constitutes "promulgation" of the regulations.[6]
 
 
 35
 This ambiguity has no bearing on the issue before us. As discussed above, §§ 9613(g) and 9651(c) are only susceptible to one interpretation on the issue of whether both Type A and B regulations must be promulgated to trigger the statute of limitations. We need not determine when the Type A and Type B regulations were promulgated given the subsequent invalidation of the regulations. The action is timely regardless of whether the subsequent invalidation of the regulations affects the date the regulations are considered to have been promulgated for the purpose of § 9613(g).
 
 
 36
 For these reasons, we reject Montrose's argument that sections 9613(g) and 9651(c) are ambiguous concerning whether both Type A and Type B regulations must be promulgated to start the statute of limitations running.
 
 C.
 
 37
 Because we conclude that the language of these sections is not ambiguous, we must follow the plain language of these sections unless the legislative history clearly indicates Congress intended otherwise. See Central Montana Elec., 840 F.2d at 1477. Montrose argues that Congress was not concerned with the promulgation of Type A regulations under § 9651(c) and therefore Congress intended the statute of limitations in § 9613(g)(1)(B) to begin running on the date Type B regulations were promulgated. The legislative history does not support this interpretation of either section.
 
 1.
 
 38
 To begin, nothing in the legislative history cited by Montrose indicates that Congress was only concerned with the promulgation of Type B regulations under § 9651(c). CERCLA was initially enacted on December 11, 1980. At that time, the President was required to promulgate regulations--both Type A and Type B-for the assessment of damages to natural resources by December 11, 1982. 42 U.S.C. § 9651(c)(1) (1982). DOI, however, failed to meet the statutory deadline and therefore was under a court order to promulgate final Type A regulations by October 7, 1986 and final Type B regulations by June 23, 1986. See 51 Fed.Reg. at 27,675.
 
 
 39
 DOI had begun to promulgate both Type A and Type B regulations pursuant to the court's order while the Superfund Amendments and Reauthorization Act ("SARA") was being passed. DOI proposed initial Type B procedures on December 20, 1985 for notice and comment; it proposed initial Type A procedures on May 5, 1986 for notice and comment. The final Type B regulations were promulgated on August 1, 1986. The final Type B rule noted that § 9651(c) required DOI to promulgate both Type A and B regulations; it also noted that Type A regulations had been proposed and would be promulgated in final form pursuant to the court's deadline. Id. at 27674-75. The final Type A regulations were promulgated on March 20, 1987.
 
 
 40
 Although both Type A and B regulations were about to become (or had become) final, in SARA, Congress specifically addressed the problem created by the President's failure to promulgate the § 9651(c) regulations by extending the deadline for their promulgation until April 17, 1987. Prior to the promulgation of final Type A regulations (but after the promulgation of final Type B regulations), the House conference report for SARA explained the reasons for the amended deadline as follows:The conference substitute adopts the Senate provision that directed the President to promulgate the regulations for assessing damages to natural resources under section 301 of CERCLA not later than six months after enactment, but relocates it as an amendment to section 301 itself. The deadline established by these amendments differs from that currently imposed by the court in New Jersey v. Ruckelshaus, Civil Action No. 84-1668(JWB) (D.C.N.J.1984), solely for the purpose of allowing additional time, if necessary, for the reproposal of regulations required by section 301(c) should those initially submitted to the court be inadequate. While acknowledging the failure of the President to promulgate those regulations, this amendment does not sanction that failure or any further delay unless it is essential to assure the adequacy of the regulations.... Regulations were proposed under this section in December, 1985, and it may be necessary to repropose this regulation to come into conformity with the provisions of section 301(c) and the amendments to section 107(f).
 
 
 41
 H.R. Conf. Rep. No. 99-962, 99th Cong., 2d Sess., at 205 (1986) ("H.R.Conf.Rep."), reprinted in 1986 U.S.C.C.A.N. 3276, 3298.
 
 
 42
 Montrose contends that the above report "demonstrates that Congress did not regard the proposed coastal zone Type A procedures as significant," because the report only refers to regulations that were proposed in December, 1985, i.e., the Type B regulations. Thus, Montrose claims, Congress did not intend for the statute of limitations to be triggered by the promulgation of Type A regulations.
 
 
 43
 This argument is unpersuasive. First, the report quoted above makes no mention of the statute of limitations and does not purport to explain which "regulations" under § 9651(c) must be promulgated in order to trigger the running of the statute of limitations. Second, the report does not purport to discuss which regulations Congress views as important. Instead, the report provides an explanation for why Congress chose to extend the deadline for promulgating the regulations required by § 9651(c)--because the court-imposed deadline might not be sufficient if the regulations submitted to the court were inadequate.
 
 
 44
 Third, Montrose attributes far more meaning to the single mention of the December 1985 regulations than is warranted. There is no basis for making the leap from the report's mention of the December 1985 promulgation of regulations to the conclusion that Congress "did not regard the proposed coastal zone Type A procedures as significant." Fourth, Montrose acknowledges that the report contains several errors concerning the progress of DOI in promulgating the regulations: it neglects to mention that final Type B regulations were promulgated on August 1, 1986; it neglects to mention that proposed Type A regulations were issued in May, 1986. Moreover, the report does not even mention Type A or Type B regulations by name. Apparently, Congress was not precisely tracking this process.
 
 
 45
 Finally, the report consistently mentions the "regulations required by section 301(c);" it is equally clear that both Type A and Type B regulations were required by that section. Nothing in the report alters the fact that Congress required the President to promulgate Type A regulations in the statute, regardless of whether one set was more or less important.
 
 2.
 
 46
 In addition, Montrose contends that interpreting § 9613(g)(1)(B) as triggering the statute of limitations once both Type A and Type B regulations were promulgated is contrary to Congress' intent that natural resource damage actions be brought promptly. This argument lacks merit as well.
 
 
 47
 SARA amended CERCLA's statute of limitations in order to address the problem trustees of natural resources faced due to the President's failure to enact assessment regulations under § 9651(c). Howmet Turbine, 814 F.2d at 1379; see also Kennecott Utah Copper v. U.S. Dept. of Interior, 88 F.3d 1191, 1209-10 (D.C.Cir.1996). Previously, 42 U.S.C. § 9612(d) required that actions be brought within three years of the enactment of the statute or the discovery of loss, whichever was later. 42 U.S.C. § 9612(d) (1982) (superseded). In explaining the new limitations provision the Conference Report states:
 
 
 48
 With respect to civil actions for natural resource damages, the conference substitute adopts new section 113(g) of CERCLA as set forth in the House amendment ... One modification based on the Senate amendment, requires that a civil action be commenced within three years after the later of (1) the date of the discovery of the loss and its connection with the release in question or (2) the date on which final natural resource damages regulations are promulgated.
 
 
 49
 * * *
 
 
 50
 The Conferees have adopted these amendments relating to the time limits for initiating actions for natural resource damages because the ability for Federal and State trustees to pursue such claims and actions has been impaired by the failure of the President to promulgate regulations governing procedures for filing claims and assessing damages to natural resources. These amendments are intended to revive causes of action for natural resource damages that may have been foreclosed by the running of the statute of limitations relating to such actions under current law.
 
 
 51
 H.R. Conf. Rep. at 223, reprinted in 1986 U.S.C.C.A.N. at 3316 (emphasis supplied).
 
 
 52
 Thus, Congress specifically intended to revive natural resource damage actions that had been foreclosed by CERCLA's original statute of limitations. Although it is true that Congress did not sanction DOI's failure to promulgate the original regulations required by § 9651(c), Congress amended the statute of limitations to make it dependent upon the date that final natural resource damage regulations were promulgated, because of the prior difficulty trustees encountered due to DOI's failure to promulgate the regulations. In addition, the report makes no distinction between Type A or Type B regulations; nor does it indicate that only one set of regulations would be sufficient to trigger the statute of limitations. Thus, contrary to Montrose's claim, the above report does not demonstrate that Congress intended only one set of the required regulations to trigger the statute of limitations.
 
 3.
 
 53
 Montrose's remaining arguments can be summarized as follows: (1) Type A regulations are not necessary for assessing natural resource damages in this action and therefore Congress could not have intended that the statute of limitations be triggered by the promulgation of Type A regulations; and (2) DOI has not yet promulgated all Type A regulations; therefore it would be absurd to hold that the statute of limitations was dependent on the promulgation of these regulations and thus had not yet begun to run. We reject both arguments.
 
 
 54
 First, the fact that Type A regulations were not utilized for the damage assessment in this action has no relevance at all to which regulations trigger the running of the statute under § 9613(g)(1). Montrose's argument ignores that Congress specifically required that both Type A and Type B regulations be promulgated under § 9651(c). Simply because the simplified assessments provided for in Type A procedures were not used here, does not mean that the promulgation of these regulations did not trigger the statute of limitations.
 
 
 55
 Second, Montrose argues that because the final Type A regulations have not yet been promulgated for all environments, we should interpret § 9613(g)(1)(B) not to require their promulgation to trigger the statute of limitations. However, as noted above, this argument is directed at interpreting when the regulations are considered "promulgated"--not which regulations must be promulgated.[7]
 
 
 56
 Lastly, the fact that DOI may have failed to comply with the clear statutory mandate of § 9651(c) to promulgate Type A regulations by April 17, 1987 does not alter the fact that Congress, in the face of previous delays by DOI to promulgate the same regulations, deliberately chose to trigger the statute of limitations based upon the date those same regulations were promulgated.
 
 
 57
 For these reasons, we reject Montrose's remaining arguments concerning the regulatory prong of the statute of limitations.[8]
 
 IV.
 
 58
 The Trustees also contend that the district court erred in its interpretation of the $50 million cap contained in 42 U.S.C. § 9607(c)(1)(D). The district court held that "[p]ursuant to 42 U.S.C. § 9607(c)(1)(D), and based on the allegations in Plaintiffs' Complaint, the Montrose defendants' collective maximum liability for 'damages' on Claim One is 'the total of all costs of response plus $50,000,000.' "
 
 
 59
 Although the court did not explain its reasoning in its written order, at the January 6, 1995 hearing the court stated two bases for this holding: (1) all the releases by the Montrose defendants' facility over the entire time period alleged in the complaint constituted one "incident involving release" under the statute; and (2) the Montrose site was one "facility" and therefore the statute applied a $50 million cap for all releases from the Montrose defendants' facility. The Trustees argue that the district court's interpretation of § 9607(c) is contrary to the plain language of the statute.
 
 A.
 
 60
 Again, we must first look to the statutory language of 42 U.S.C. § 9607(c). This section provides:
 
 
 61
 (c) Determination of amounts
 
 
 62
 (1) Except as provided in paragraph (2) of this subsection, the liability under this section of an owner or operator or other responsible person for each release of a hazardous substance or incident involving release of a hazardous substance shall not exceed--
 
 
 63
 * * *
 
 
 64
 (D) for any incineration vessel or any facility other than those specified in subparagraph (C) of this paragraph, the total of all costs of response plus $50,000,000 for any damages under this subchapter.
 
 
 65
 42 U.S.C. § 9607(c)(1) (1995).
 
 B.
 
 66
 First, the Trustees argue that the plain language of § 9607(c)(1) establishes liability for each owner or operator or other responsible party separately-not collectively. Section 9607(c)(1) states "the liability under this section of an owner or operator or other responsible person for each release ... shall not exceed ... for ... any facility ... the total of all costs of response plus $50,000,000." Id. The phrase "the liability ... of an owner or operator or other responsible person ... shall not exceed ..." can only be read as placing a limit on the liability of each owner or operator--not all owners or operators collectively.[9]
 
 
 67
 The Montrose defendants do not directly contest this interpretation of the above language.[10] Rather, they focus their arguments on the other two components of § 9607(c)(1), arguing that the Complaint's allegations only establish one "incident involving release" and one "facility."
 
 C.
 
 68
 The Trustees argue that the district court erred in holding that the Complaint alleged only one "incident involving release." The Montrose defendants contend that because the term "incident involving release" is undefined by CERCLA, the court should adopt a definition of the phrase that comports with the legislative history of that phrase--which, according to the Montrose defendants, equates "incident" with "contaminated site." We must determine whether the district court properly interpreted the term "incident involving release."
 
 
 69
 As noted above, § 9607(c) limits each owner/operator's liability for "each release of a hazardous substance or incident involving release of a hazardous substance" to the costs of response plus $50 million. CERCLA defines release as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C. § 9601(22) (1995).
 
 
 70
 "Incident involving release," however, is not defined by the statute. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Wilshire Westwood Assocs. v. Atlantic Richfield Corp., 881 F.2d 801, 803-04 (9th Cir.1989) (citation omitted). Moreover, if possible "incident involving release" must be interpreted to mean something other than release, in order to avoid redundancy. See Kenaitze Indian Tribe v. State of Alaska, 860 F.2d 312, 317 (9th Cir.1988) (refusing to interpret the Alaskan National Interest Lands Conservation Act to create redundancy), cert. denied, 491 U.S. 905, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989).
 
 
 71
 The Trustees argue that because "incident involving release" is undefined, "incident" should be given its ordinary dictionary definition: "an occurrence of an action or situation that is a separate unit of experience" or a "happening." Webster's Ninth New Collegiate Dictionary (1984). Thus, § 9607(c) would limit liability of each owner/operator to $50 million plus costs of response for "each release" or "each occurrence or happening involving a release." Further, the fact that the statute includes a limit on liability for "each release" implies that Congress contemplated that an owner or operator could be liable independently for several releases and that the liability cap would apply separately for each release. If, however, the releases are linked to one "incident"--one series of events of relatively short duration--the liability cap applies to that incident.
 
 
 72
 The Montrose defendants, on the other hand, contend that "incident" is a term of art, utilized throughout the legislative history of CERCLA to mean "contaminated site."[11] For several reasons, we reject this argument. First, if "incident" is a term of art as the Montrose defendants claim, Congress would have included the definition within CERCLA's definition section, such as it did for owner, operator, release, and other terms. Second, the meaning of "incident" proposed by the Montrose defendants--contaminated site--renders the statutory language nonsensical: "incident involving release of a hazardous substance" would be interpreted to mean "contaminated site involving release of a hazardous substance." This interpretation appears implausible, given that Congress could have simply written the statute to limit liability for "each contaminated site", rather than for "each release ... or incident involving release."
 
 
 73
 Third, the legislative history relied upon by the Montrose defendants does not persuasively show that "incident" is a term of art synonymous with "contaminated site." To begin, the legislative history cited utilizes the single word "incident," not the phrase "incident involving release," which is the relevant phrase here. Further, the legislative history cited supports interpreting "incident" in accord with its common meaning. For example, H.R. 85, one of CERCLA's predecessor bills, provided a definition for incident as follows: " 'incident' means any occurrence or series of occurrences, involving one or more vessels, facilities, or any combination thereof which causes or poses an imminent threat of oil pollution." H.R. 85 § 101(d), 96th Cong., 1st Sess. (1979) ("Oil Pollution Liability and Compensation Act").[12] This definition of "incident" comports with the dictionary definition of "occurrence," "happening" or "series of occurrences."
 
 
 74
 For these reasons, we reject the Montrose defendants' argument that "incident" should be interpreted as a term of art, meaning "contaminated site." Instead, we interpret "incident involving release" in accord with its common definition and the legislative history of H.R. 85 to mean an occurrence or series of occurrences of relatively short duration involving a single release or a series of releases all resulting from or connected to the event or occurrence. Thus a series of events that lead up to a spill of hazardous substance would be considered an incident involving release; however, a series of releases over a long period of time might or might not.
 
 D.
 
 75
 Last, the Montrose defendants argue that the language in § 9607(c)(1)(D) limits their collective liability for all releases from their facility to $50 million plus response costs. This argument lacks merit as well.
 
 Again, section 9607(c)(1) provides:
 
 76
 (1) ... the liability under this section of an owner or operator or other responsible person for each release of a hazardous substance incident involving release of a hazardous substance shall not exceed--
 
 
 77
 (A) for any vessel ... which carries any hazardous substance as cargo or residue, $300 per gross ton, or $5,000,000, whichever is greater;
 
 
 78
 (B) for any other vessel ... $300 per gross ton, or $500,000, whichever is greater;
 
 
 79
 (C) for any motor vehicle, aircraft, hazardous liquid pipeline facility ... or rolling stock, $50,000,000 or such lesser amount as the President shall establish by regulation, but in no event less than $5,000,000 ...
 
 
 80
 (D) for any incineration vessel or any facility other than those specified in subparagraph (C) of this paragraph, the total of all costs of response plus $50,000,000 for any damages under this subchapter.
 
 
 81
 Taken in the context of the entire section, the clauses "for any vessel," "for any motor vehicle" and "for ... any facility" clearly serve to differentiate among the categories such as incineration vessel and motor vehicle so that Congress could impose different liability limits on the owners or operators of these different vessels or facilities. Thus, depending upon whether one is the owner of a motor vehicle or a vessel carrying a hazardous substance, one's liability for each release of a hazardous substance is capped at a different amount. Any other interpretation of the above language would render the clause "the liability ... of an owner or operator ... for each release of a hazardous substance" meaningless.
 
 E.
 
 82
 The district court concluded that the Montrose defendants' collective liability was capped at $50,000,000 because this case involved only one "incident involving release." Given that "incident involving release" should be interpreted as "occurrence" or "event" involving release, we believe the record was inadequate to support the district court's conclusion that the Complaint alleged only one "incident involving release." Although we determine that the district court's order must be reversed, the record now before us is insufficient for us to decide more. How and whether the $50,000,000 cap will apply to the defendants in this case must be left to further development of the record and further proceedings.
 
 V.
 
 83
 The Trustees also request that this case be reassigned upon remand pursuant to the court's supervisory powers under 28 U.S.C. §§ 455(a) and 2106. As a preliminary matter, the Montrose defendants are correct that the Trustees may not raise a § 455(a) claim on appeal that has not first been raised in the district court. See United States v. Sears, Roebuck & Co., 785 F.2d 777, 780 (9th Cir.), cert. denied, 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). However, we have jurisdiction to consider a request for reassignment under § 2106 as well as under our inherent authority to reassign a case. Id.
 
 
 84
 Under § 2106, remand to a different district court judge is appropriate if there is "a demonstration of personal bias or in 'unusual circumstances.' " Smith v. Mulvaney, 827 F.2d 558, 562 (9th Cir.1987). In determining whether unusual circumstances exist the court considers:
 
 
 85
 (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.
 
 
 86
 Id. at 562-63 (citations omitted). The first two factors are considered to be of equal importance; moreover, a finding of either one would support remand to a different judge. Sears, Roebuck, 785 F.2d at 780.
 
 
 87
 Here, the government argues that the case should be reassigned in order to preserve the appearance of fairness. The government points to numerous comments made by the lower court at the March 22, 1995 hearing, including references to environmental scientists as "pointy heads" and "so-called experts"; references to what the court suspected was improper contact between the NRDC and Felicia Marcus, the Administrator of EPA region IX; the court's displeasure with the government due to our reversal of a consent decree the government entered into with the municipal defendants in this case; and the lower court's general displeasure with the Department of Justice.
 
 
 88
 We agree that these comments are not as restrained as we would wish them to be. On the other hand, there is no indication in the March 22, 1995 transcript that the judge was ruling against the government based upon any of his often expressed opinions concerning environmental science or the government. To the contrary, the district judge had considered these same issues on review of the special master's orders twice previously and both times expressed his inclination to rule in the manner he ultimately did. However, he referred the motions back to the special master for further findings.
 
 
 89
 We have reassigned cases based upon the "appearance of justice" in few situations. See, e.g., Sears, Roebuck, 785 F.2d at 781 (reassignment warranted on the fourth pre-trial appeal, after the district judge had dismissed the indictment for third time, was adamant in his rulings and in expressing his opinion that the prosecutor's conduct was egregious); In re Yagman, 796 F.2d 1165, 1188 (9th Cir.1986) (matter reassigned where trial was permeated by attorney bickering and misconduct and trial court invited sanctions motion and granted $250,000 sanctions award against defense attorney); United States v. Jacobs, 855 F.2d 652, 656-57 (9th Cir.1988) (reassignment warranted where trial judge summarily dismissed indictment in error; refused to reassemble the jury when two minutes later the mistake was discovered; denied the motion for reconsideration after the government had proven no misconduct; allowed the defendants to file an untimely motion to dismiss; criticized the government's handling of the case in the jury's presence; and offered strategic advice to one defendant).
 
 
 90
 The common thread in these cases is that the district court's expressions of frustration with an attorney or party somehow appeared to affect his or her handling of the substantive issues in the case. Here, it appears that the district judge's verbal excesses had no affect on his substantive decisions. Therefore, we deny the government's request for reassignment.
 
 VI.
 
 91
 For the foregoing reasons, we REVERSE the district court's grant of summary judgment and its order limiting the collective liability of the Montrose defendants to $50 million plus costs of response. We DENY the government's request for reassignment on remand.
 
 
 
 *
 Hon. Myron H. Bright, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 The district court certified both orders for interlocutory appeal
 
 
 [2]
 This rule "stands for the proposition that in the vast majority of its legislation Congress does mean what it says and thus the statutory language is normally the best evidence of congressional intent." Id
 
 
 [3]
 Note that both sets of regulations were promulgated within the statutory deadline of § 9651(c)(1), which required that the regulations be promulgated within 6 months of October 17, 1986, i.e., by April 17, 1987. 42 U.S.C. § 9651(c) (1995)
 
 
 [4]
 The district court also failed to point to any specific ambiguity in the language of sections 9613(g) and 9651(c); the court simply stated "CERCLA is anything but a model of lucid legislation," and then moved on to consider the legislative history of the two sections
 
 
 [5]
 Montrose also argues that DOI cannot simply continue to promulgate Type A regulations, claiming that the original Type A regulations are incomplete. Again, this argument has no bearing on whether Type A regulations were required by § 9651(c) and thus had to be promulgated initially to trigger the statute of limitations
 
 
 [6]
 Section 9613(g)(1)(B) does not address the effect of a court invalidating the Type A and B regulations on when the statute of limitations begins to run. Under the very terms of § 9651(c), both Type A and Type B regulations had to be promulgated within 6 months of October 17, 1986-by April 17, 1987. 42 U.S.C. § 9651(c)(1) (1995). Moreover, § 9651(c)(3) provides for the regulations to be revised every two years thereafter. Thus, the language of the statute indicates that the latest date Congress contemplated that the statute of limitations would begin to run under § 9613(g)(1)(B) was within three years of the promulgation of the regulations required by § 9651(c)--which had to be promulgated by April 17, 1987
 
 
 [7]
 Moreover, we believe DOI's attempt to claim that the March 20, 1987 Type A regulations were not complete and therefore did not trigger the statute of limitations would fail. When promulgating the final Type A regulations on March 20, 1987, DOI stated numerous times in the preamble that the rule was the "final" Type A procedure. It gave no indication that the rule was incomplete because it only pertained to marine and coastal environments. See 52 Fed.Reg. 9042. DOI did note that it was in the process of reviewing SARA in order to determine whether "amendments" to the final rule were necessary. Id. In addition, when promulgating the final Type B regulations, DOI noted that it had already promulgated "initial" Type A procedures for coastal and marine environments, and that "at a later date" the procedures might be expanded to cover other ecosystems. 51 Fed.Reg. at 27675
 Nothing in the statute indicates that these "amendments" or "expansions" would affect the statute of limitations. To the contrary, the legislative history discussed above demonstrates that Congress intended to trigger the statute of limitations when the final regulations were promulgated-not when subsequent revisions were promulgated. Similarly, § 9651(c)(3) directs the President to review and revise the Type A and B regulations every two years; however, the statute of limitations is not affected by these revisions.
 Finally, we note that the D.C. Circuit recently rejected DOI's argument that the statute of limitations would not begin to run until the Type A and Type B regulations were revised pursuant to Colorado v. U.S. Dept. of Interior, 880 F.2d 481 (D.C.Cir.1989) and Ohio v. Interior, as stated in 42 C.F.R. § 11.91(e) (1994). Kennecott Utah Copper, 88 F.3d at 1209-13. To the contrary, the D.C. Circuit held that the latest date on which the regulations were "promulgated" for the purpose of triggering the statute of limitations was the date on which the Type A regulations were published in the Federal Register. Id. at 1213.
 
 
 [8]
 Because we hold that the statute of limitations did not begin to run until both Type A and B regulations were promulgated, we do not reach the parties' arguments regarding the date of discovery of the loss
 
 
 [9]
 Note that under § 9607(a)(4), any owner, operator or other responsible party is strictly liable for all costs of removal or remedial action, any other necessary response costs, damages for injury to natural resources and the costs of any health assessments. 42 U.S.C. § 9607(a)(4) (1995). This liability is joint and several, subject to the defenses set forth in § 9607(b). See, e.g., United States v. Carolina Transformer Co., 978 F.2d 832, 836 (4th Cir.1992); International Fabricare Institute v. U.S. E.P.A., 972 F.2d 384, 390 (D.C.Cir.1992). Thus, it is § 9607(a) that establishes the liability of each owner or operator, § 9607(b) that sets forth the defenses and § 9607(c) that limits that liability to the specified amount
 
 
 [10]
 The Montrose defendants argue that the Complaint seeks to treat the Montrose defendants as "a single enterprise" by alleging that each corporate defendant " 'actively participated with Montrose in the operation of the Montrose defendants plant during its period of operation.' " Chris-Craft Br. at 20. Therefore, they argue, the government cannot seek to apply the liability cap to each owner, operator or other responsible party. The Montrose defendants cite no authority for this argument, nor do they reference the language of the statute to offer an alternative interpretation of the phrase "the liability ... of an owner or operator ... shall not exceed...."
 
 
 [11]
 "Departure from a literal reading of statutory language may ... be indicated by relevant internal evidence of the statute itself and necessary in order to effect the legislative purpose." Wilshire Westwood, 881 F.2d at 804
 
 
 [12]
 Due to the lack of legislative history for CERCLA, this court has looked for guidance to the three competing bills, H.R. 85, H.R. 7020, 96th Cong., 2d Sess., (1980) ("Hazardous Waste Containment Act"), and S. 1480, 96th Cong., 1st Sess., (1979) ("Environmental Emergency Response Act"), which ultimately resulted in the compromise enactment of CERCLA. Wilshire Westwood, 881 F.2d at 805-06 (noting that CERCLA was a compromise among three bills and relying on legislative history of S. 1480)