189 F.3d 838 (9th Cir. 1999)
 UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
BILL LAWRENCE, Defendant-Appellant.
 No. 97-10107
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted June 12, 1998
Filed September 7, 1999
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Gary K. Dubcoff and Marcus S. Topel, Topel & Goodman, San Francisco, California, for the defendant-appellant.
 Crandon Randell, Assistant United States Attorney, Anchorage, Alaska, for the plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of California. Charles A. Legge, District Judge, Presiding, D.C. No. CR-94-00542-1-CAL.
 Before: J. Clifford Wallace, Thomas G. Nelson, and Andrew J. Kleinfeld, Circuit Judges.
 Opinion by Judge T.G. Nelson; Partial Concurrence and Partial Dissent by Judge Kleinfeld
 T.G. NELSON, Circuit Judge:
 
 
 1
 Defendant Bill Lawrence appeals both his convictions and his sentence for violations of 18 U.S.C. SS 1341 and 152(1), (3). We have jurisdiction over this timely filed appeal pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742. We reverse Lawrence's mail fraud conviction from the first trial, affirm his convictions following the second trial, and remand for resentencing.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 2
 Bill Lawrence was an Anchorage attorney and businessman, involved with numerous ventures in Alaska and throughout the northwestern United States. He declared bankruptcy in January 1991. On December 14, 1994, a nine-count felony indictment was returned against him, charging Lawrence with one count of mail fraud, in violation of 18 U.S.C. S 1341, and eight counts of bankruptcy fraud, in violation of 18 U.S.C. S 152(1) and (3). A three-count superceding information was later filed, consolidating the seven false-statement claims under S 152(3) into a single count. Accordingly, the superceding information charged Lawrence with three counts: (1) mail fraud, in violation of 18 U.S.C. S 1341 ("count one"); (2) false-statements bankruptcy fraud, in violation of 18 U.S.C. S 152(3) ("count two"); and (3) concealment-ofassets bankruptcy fraud, in violation of 18 U.S.C.S 152(1) ("count three").
 
 
 3
 Lawrence was married to Jody Watkins, a Delta Airlines flight attendant. Their union was one of convenience--she gained tax benefits, and he got to fly for free on her airline as well as receive estate planning benefits. The couple lived apart, rarely saw one another, and dated other people.
 
 
 4
 Throughout the trial, the Government elicited testimony, over Lawrence's objections, which emphasized the unconventional nature of his relationship with Watkins. Lawrence's failure to disclose his marriedstatus to other women with whom he was romantically involved was addressed in the Government's closing argument. The Government referred to this as "the big lie," asking the jury whether they could "think of a worse lie offhand. How many worse lies or more cruelty than letting a woman think that you are available to her to become involved in her life when in fact you're married to a woman that you rarely see for other reasons? That's a pretty significant lie." Lawrence also objected to the Government's admission of testimony concerning Lawrence's planned lifestyle following bankruptcy, as well as his access to large amounts of money within three months of bankruptcy. These objections were overruled.
 
 
 5
 On May 24, 1995, the jury returned general guilty verdicts on counts one and two; it was unable to reach a verdict on count three. Lawrence then moved for a new trial. Pursuant to Supreme Court authority handed down in June 1995, United States v. Gaudin, 515 U.S. 506 (1995), Lawrence argued that the materiality issue with respect to count two should have been decided by the jury. The district court agreed and granted a new trial on count two.
 
 
 6
 Prior to the second jury trial on counts two and three, Lawrence made a motion in limine seeking to prevent the Government from introducing evidence of his personal lifestyle. The district court held that while evidence of Lawrence's marriage was relevant as it related to property matters--"assets, liabilities, transfers of assets, things like that"--evidence concerning witnesses' knowledge of Lawrence's marital status and the circumstances surrounding it "sounds like [the Government was] throwing a little dirt in" and is not "a fair shot." With respect to the evidence regarding Lawrence's post bankruptcy financial status, the court held that the "availability of cash subsequent to the bankruptcy is relevant . . . what he was doing with money and property following the bankruptcy is relevant."
 
 
 7
 The second jury convicted Lawrence on counts two and three. As to count two, the jury found him guilty of making a false declaration by failing to set forth the existence of a bank account in the name of a former business, L'Image, Ltd., in his bankruptcy petition. The jury found him not guilty for allegedly making a false declaration that he owed a former partner $85,000 on a promissory note. The jury could not decide as to the remaining five alleged false declarations. As to count three, the jury found Lawrence guilty of concealing his ownership of Alaska Investment Group, but not guilty as to concealing an antique desk or his interest in Korlyn Broadcasting, Inc. The jury could not decide on the remaining three alleged concealments, which included shares in Photo Express Image Centers, Inc., a partnership interest in 60 Minute Photo Express and Investors Realty Trust, an account allegedly created as a trust for his children. Lawrence moved for judgment of acquittal challenging the sufficiency of the jury's verdict as to the concealment of Alaska Investment Group and Investors Realty Trust. The district court denied Lawrence's motion.
 
 
 8
 At the sentencing hearing, following briefing by the parties regarding relevant conduct and how it should be determined, the court valuated the loss at $574,700, without the assistance of an evidentiary hearing because it concluded that the evi-dence adduced at the trial was sufficient. Lawrence's motion for reconsideration was denied. Accordingly, the court sentenced him to fifty-one months in prison followed by a oneyear supervised release. In addition, Lawrence was ordered to pay restitution of $574,700 as well as a $150 special assessment. Lawrence then brought this timely appeal.
 
 II. ANALYSIS
 
 9
 A. Evidence of Lawrence's Marriage During the First Trial
 
 
 10
 Evidentiary rulings are reviewed for an abuse of discretion. See EEOC v. Pape Lift, Inc., 115 F.3d 676, 680 (9th Cir. 1997). Evidence is inadmissible if it is not relevant, Fed. R. Evid. 401, or "if its probative value is substantially outweighed by the danger of unfair prejudice," Fed. R. Evid. 403.
 
 
 11
 The testimony elicited by the Government regarding Lawrence's marriage and the circumstances of that relationship was not probative of Lawrence's guilt or innocence of the crimes with which he was charged. Any relevance this testimony may have had is easily outweighed by the unfair prejudicial effect it had on the jury's ability to focus on the issues relevant to the charges. See United States v. Hitt, 981 F.2d 422, 424 (9th Cir. 1992) ("Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury."). Accordingly, the district court abused its discretion in allowing this testimony to be heard by the jury.
 
 
 12
 This is not the end of our inquiry; we must also consider whether the error in admitting the evidence of the marriage was harmless. See United States v. Crosby, 75 F.3d 1343, 1349 (9th Cir. 1996). We hold that the error was not harmless. Lawrence's only defense to the mail fraud charge was that he did not act with a fraudulent intent. The only evidence supporting this defense was Lawrence's testimony explaining that he made the purchases in good faith and at the time had every intention of fulfilling his obligations to his creditors. The improperly admitted testimony delivered a fatal blow to Lawrence's credibility, infecting the jury's ability to make an unbiased assessment of it. Accordingly, we reverse Lawrence's mail fraud conviction and remand for a new trial or other appropriate disposition.
 
 
 13
 B. Jury Instructions Given During the Second Trial
 
 
 14
 Whether a district court's jury instructions adequately covered a defendant's proffered defense is reviewed de novo, See United States v. Amlani, 111 F.3d 705, 716 n.5 (9th Cir. 1997), as is the question of whether an instruction misstated an element of a statutory crime, See United States v. Loaiza-Diaz, 96 F.3d 1335, 1336 (9th Cir. 1996).
 
 
 15
 Lawrence argues that the jury instructions given by the district court failed to adequately address his theory of defense--namely that his actions were not accompanied by a fraudulent intent. The instructions included the statements that "[i]f you find that Mr. Lawrence acted in good faith, that is a complete defense to the charges in the superseding information because good faith on Mr. Lawrence's part would be inconsistent with an intent to defraud," and"[y]ou should consider all the evidence in the case bearing on Mr. Lawrence's acts and his state of mind." These instructions more than adequately covered Lawrence's defense theory. It is not error to "reject a theory-of-the-case instruction if the other instructions in their entirety cover the defense theory." United States v. Lopez, 885 F.2d 1428, 1434 (9th Cir. 1989), overruled on other grounds, Schmuck v. United States, 489 U.S. 705 (1989). The district court's failure to give Lawrence's theory-of-defense instruction did not constitute an abuse of discretion.
 
 
 16
 In addition, the district court did not abuse its discretion by rejecting Lawrence's requested jury instruction concerning the validity of his marriage to Jody Watkins under Alaska law. As noted above, Lawrence's marriage to Watkins was not relevant to the case. In the second trial, the district court granted Lawrence's motion in limine prohibiting the Government from making inappropriate references to the marriage, thus rendering the proposed instruction unnecessary. The district court did not abuse its discretion in rejecting the instruction.[1]
 
 C. The Sentence
 
 17
 The district court's interpretation of the sentencing guidelines is reviewed de novo, see United States v. Boos, 127 F.3d 1207, 1209 (9th Cir. 1997), and its factual findings with respect to calculation of monetary loss to victims are reviewed for clear error, see United States v. Clayton, 108 F.3d 1114, 1118 (9th Cir. 1997). Findings of fact must be supported by a preponderance of the evidence; the relevant facts must be shown to be more likely true than not. See id.
 
 
 18
 1. Inclusion of Investors Realty Trust in Loss Calculation.[2]
 
 
 19
 Lawrence challenges the district court's inclusion of his concealment of the Investors Realty Trust as related conduct in the loss calculation under section 2F1.1 of the sentencing guidelines. Section 2F1.1 provides for increases to a defendant's offense level based upon the amount of loss the defendant intended to inflict or actually inflicted as a result of fraudulent conduct.
 
 
 20
 Under the sentencing guidelines, a district court is required to consider "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction" when determining the appropriate sentence. See United States Sentencing Commission, Guidelines Manual, S 1B1.3 (Nov. 1995). "Conduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable sentencing range." USSG S 1B1.3, comment. (backg'd). The acts must merely be "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." USSG S 1B1.3, comment. (n.9(A)). Further, "[t]he cumulative loss produced by a common scheme or course of conduct should be used in determining the offense level, regardless of the number of counts of conviction. " USSGS 2F1.1, comment. (n.6); see also United States v. Fine, 975 F.2d 596, 599-600 (9th Cir. 1992) ("[C]onduct which was part of the scheme is counted, even though the defendant was not convicted of crimes based upon the related conduct.").
 
 
 21
 Where, as here, a portion of the defendant's sentence is based on conduct for which he was not convicted, it is valuable to remember the function of sentencing enhancements under the guidelines:
 
 
 22
 [S]entencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction . . . . [C]onsideration of information about the defendant's character and conduct at sentencing does not result in punishment for any offense other than the one of which the defendant was convicted. Rather, the defendant is punished only for the fact that the present offense was carried out in a manner which warrants increased punishment.
 
 
 23
 United States v. Watts, 519 U.S. 148, 154-55 (1997) (citations, emphasis and quotation marks omitted). Further, because different standards of proof apply at the trial and sentencing phases--beyond a reasonable doubt versus preponderance of the evidence--a jury's indecision on a criminal charge does not preclude the court from considering the underlying conduct as a part of its sentencing decision. Id. at 155-56.
 
 
 24
 Turning to the issue at hand, we must determine whether there was a preponderance of the evidence to support the conclusion that Lawrence concealed Investors Realty Trust in his bankruptcy petition. Whether property belongs to the debtor, and therefore the bankruptcy estate, is determined by state law. In re Harrell, 73 F.3d 218, 219 (9th Cir. 1996). Assets transferred to an irrevocable trust do not become part of the estate unless the transfer or the trust is invalid. Under the Uniform Fraudulent Transfer Act, a transfer to a trust established to defraud the settlor's creditors is void. See Alaska Stat. SS 34.40.110, 34.40.010. Abuse of a trust by a settlor, such as using it as a private bank account, is evidence of intent to defraud creditors and therefore supports setting aside the trust and allowing the settlor's creditors to reach the trust res.
 
 
 25
 Here, the terms of the Investors Realty Trust prohibited Lawrence, as the settlor, from taking unsecured loans from the trust or from exercising any control over the management of the trust. The Government's expert witness reviewed the transactions of the Investors Realty Trust and detailed the numerous unsecured loans to Lawrence and others from the trust and checks written by Lawrence on the trust. As an example, the expert witness testified that upon Lawrence's sale of some real estate in late 1979, Lawrence transferred $50,230 into the trust and nine days later Lawrence took a $50,000 unsecured loan from the trust. The expert testified to at least five unsecured loans to Lawrence in amounts ranging from approximately $40,000 to $60,000. The expert also testified that in addition to checks made out for educational purposes--one of the intended benefits stated in the trust document--other checks, many signed by Lawrence, were made out to companies associated with Lawrence, banks, and credit card companies. The expert concluded that Investors Realty Trust "was not treated as an irrevocable trust" and that "it [was] clear that this trust was used as a place for obtaining personal use of funds."
 
 
 26
 The jury could not decide whether Lawrence was guilty of concealing the Investors Realty Trust on his bankruptcy petition. However, the district court found that Lawrence concealed the Investors Realty Trust, which should have been a part of the bankruptcy estate. This factual finding is not clearly erroneous. The district court did not clearly err in finding that Lawrence lacked the actual intent to create such an irrevocable trust as evidenced by his actions which were inconsistent with the terms of the trust. The Government showed by a preponderance of the evidence that Lawrence did not intend to create an irrevocable trust and instead used the Investors Realty Trust as his personal bank account so as to evade the bankruptcy rules and conceal his assets. Thus, it was not clearly erroneous for the district court to include the value of the Investors Realty Trust in the loss calculation for sentencing purposes.
 
 
 27
 The dissent cites Summers v. Hagen, 852 P.2d 1165 (Alaska 1993), for the proposition that the district court could only find the trust void if the evidence established a "fraudulent scheme." Summers, however, established that a creditor may maintain a damages action against a grantee, in addition to voiding the transfer, for participation in a "conspiracy to fraudulently convey property,[which was] a novel theory of liability in Alaska." 852 P.2d at 1167. The elements of this claim, set forth by thedissent, have nothing to do with finding a trust void under Alaska Stat.S 34.40.110.
 
 
 28
 2. Loss Valuation.
 
 
 29
 Lawrence also asserts that the district court should have held a hearing to determine the loss valuation. In arriving at a loss valuation for purposes of applying Sentencing Guideline S 2F1.1, the Government has the burden of proving the loss defendant caused or intended to cause by a preponderance of the evidence. See United States v. Howard, 894 F.2d 1085, 1090 (9th Cir. 1990). The district court's valuation "need not be determined with precision." USSGS 2F1.1, comment. (n.8). "The court need only make a reasonable estimate of the loss, given the available information. " Id. Here, the district court used values obtained from documents prepared by Lawrence himself. This valuation was not clearly erroneous, and it was not an abuse of discretion not to hold a hearing on the matter.
 
 D. The Restitution Order
 
 30
 A restitution order is reviewed for abuse of discretion, provided that it is within the bounds of the statutory framework. See United States v. Nash, 115 F.3d 1431, 1441 (9th Cir. 1997). Factual findings supporting such orders are reviewed for clear error. See United States v. Petersen , 98 F.3d 502, 509 n.7 (9th Cir. 1996).
 
 
 31
 1. Scope of the Restitution Order.
 
 
 32
 Under the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. S 3663, restitution may only be ordered for "the loss caused by the specific conduct that is the basis of the offense of conviction." Hughey v. United States, 495 U.S. 411, 413 (1990); see also United States v. Baker, 25 F.3d 1452, 1456 (9th Cir. 1994). In United States v. Sharp, 941 F.2d 811 (9th Cir. 1991), based on the reasoning of Hughey, this court held that "[e]ven when the offense of the conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction." Id. at 815.
 
 
 33
 However, in 1990, Congress amended the VWPA's definition of victim to partially overrule Hughey. See United States v. Reed, 80 F.3d 1419, 1423 (9th Cir. 1996). A "victim" is "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. S 3663(a)(2) (1990).[3] Under the VWPA amendment "restitution may be ordered for losses to persons harmed in the course of the defendant's scheme even beyond the counts of conviction." United States v. Rutgard, 116 F.3d 1270, 1294 (9th Cir. 1997). The VWPA amendment supersedes this court's decision in Sharp "insofar as the offense of conviction includes a scheme to defraud as an element of the offense." United States v. Johnson, 132 F.3d 1279, 1286-87 (9th Cir. 1997); see also United States v. DeSalvo, 41 F.3d 505, 515 (9th Cir. 1994) ("When Congress amended the VWPA in 1990, it appeared to overrule this Court's decision in Sharp."). Thus, only when the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, may the restitution order include acts of related conduct for which the defendant was not convicted. See Reed, 80 F.3d at 1423. Otherwise, Hughey and Baker continue to prohibit the inclusion of "loss [not] caused by the specific conduct that is the basis of the offense of conviction." Hughey, 495 U.S. at 413.
 
 
 34
 Here, the district court found, by a preponderance of the evidence, that
 
 
 35
 [a]ll of defendant's acts were done over a period of years for the purpose of defrauding creditors, business colleagues,and eventually the Bankruptcy Court. Each was done with the requisite criminal intent to defraud. Each act was not separate and distinct conduct, but was part of a pattern and practice by the defendant with the same objective and intent. Indeed, only defendant's false statements in Count Two enabled him to file his bankruptcy petition in this district. And the other false statements and concealments were part of an overall pattern and scheme to keep his assets from his creditors and to keep those assets for himself.
 
 
 36
 As such, the district court included in the restitution order losses caused by acts for which the jury did not reach a verdict. Thus, the amount of the restitution was the same as the amount used for sentencing purposes. The restitution included $59,000 for Lawrence's count one mail fraud conviction, $1,700 for Lawrence's count two false-statements bankruptcy fraud conviction, and $514,000 for Lawrence's count three concealment-of-assets bankruptcy fraud conviction. The total amount of restitution ordered was $574,700. Of this amount only $60,411 is directly attributable to the acts for which the jury found Lawrence guilty.
 
 
 37
 Count one for mail fraud includes the element of scheme.[4] Counts two and three for bankruptcy fraud contain no elements relating to scheme, conspiracy or pattern.[5] However, count one, as articulated in the superceding information, alleged that Lawrence
 
 
 38
 devised and intended to devise a scheme and artifice to defraud credit card companies and banks honoring VISA and Master Charge credit cards, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.
 
 
 39
 It was a part of the scheme and artifice that Bill Lawrence, in 1987, began talking about filing bankruptcy. In order to shield his assets from creditors, Lawrence initiated efforts to transfer certain assets to other people, and to encumber certain parcels of real estate with phoney deeds of trust. Lawrence, a lawyer specializing in tax and estate planning, said that he needed a year, or more, in which to transfer assets and prepare for bankruptcy.
 
 
 40
 Superceding Information PP 2-3 (emphasis added). It appears, therefore, that the information as to count one includes language which would cover the acts specifically alleged in counts two and three. Thus, at the time of his original sentencing by the district court, any acts which were a part of that scheme, but for which he was not convicted, could be included in the restitution award. The district court found that all of the acts--even those alleged as part of counts two and three--were a part of an overall scheme to defraud others by concealing his assets. Thus, because Lawrence was convicted of a crime that includes a scheme as an element, it was not an abuse of discretion for the district court to include the related conduct alleged in counts two and three in the restitution order.
 
 
 41
 This does not, however, end the inquiry. In this opinion, we have reversed Lawrence's count one mail fraud conviction. We have held that the district court may conduct a new trial or otherwise appropriatelydispose of Lawrence's count one conviction on remand. The outcome on remand will determine whether the district court may include acts of related conduct for which Lawrence was not convicted. If Lawrence is retried and convicted again for mail fraud, the court may, consistent with this opinion, order that Lawrence pay restitution for acts which were part of the scheme. If Lawrence is not reconvicted of mail fraud, the district court must modify its restitution order to properly reflect that fact that Lawrence was not convicted of a crime that includes scheme as an element.
 
 
 42
 2. Defendant's Ability to Pay.
 
 
 43
 In determining the amount of a restitution order, the district court is required to consider the ability of the defendant to pay. See 18 U.S.C. S 3664(a). However, when addressing the Government's request that the court make such a finding, the court stated, "I can't do that . .. I simply do not have sufficient information." Although, the statute "grants the district court broad discretion in the kind and amount of evidence required, it does not leave the district court free to disregard the statutory requirements." United States v. Ramilo, 986 F.2d 333, 335 (9th Cir. 1993) (quotation omitted). While the court is not required to make an express finding, it is required to consider this information and cannot completely defer to the monitoring capabilities of the probation officer. Thus, the district court erred by failing to consider Lawrence's ability to pay as a factor in issuing its restitution order.
 
 III. CONCLUSION
 
 44
 The legitimacy of the first trial was poisoned by the undue emphasis the Government placed on aspects of Lawrence's lifestyle which were clearly irrelevant to his guilt or innocence of the crimes he was charged with. We therefore REVERSE his mail fraud conviction from the first trial. While we AFFIRM Lawrence's convictions from the second trial, we nevertheless VACATE his sentence and REMAND the case to the district court for sentencing and determination of the appropriate amount of restitution consistent with this disposition.
 
 
 45
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 The balance of Lawrence's rejected instructions were unnecessary and would only have served to confuse the jury and mislead them from their primary inquiry: whether Lawrence violated the federal statutes in question. The district court did not abuse its discretion in rejecti9ng them.
 
 
 [2]
 In his brief, Lawrence framed this argument as an error by the district court in denying his Fed. R. Crim. P. 29 motion as to the Investors Realty Trust ("Trust") as a part of his count three conviction. However, such an issue is moot. Count three was structured as one crime: bankruptcy fraud by concealment-of-assets with several potential methods of committing it. The jury could not agree on whether Lawrence's failure to report the Trust as an asset constituted bankruptcy fraud under count three. Instead, the jury convicted Lawrence of a different fraud under that count. Because the jury did not convict Lawrence on the basis of the Trust, it would be impossible to examine a Rule 29 motion on that basis. We assume that Lawrence must be arguing that if the district court acquitted him of the Trust allegations, it could not have used those funds in the loss calculations for sentencing purposes.
 
 
 [3]
 This definition was further revised by Congress in 1996 to also include persons "proximately injured" by a defendant's criminal conduct. See Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104132, S 205(a)(1)(F), 110 Stat. 1214, 1230.
 
 
 [4]
 Whoever, having devised or intending to device any scheme or artifice to defraud, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office . . .any matter or thing whatever to be sent or delivered by the Postal Service . . . shall be fined under this title or imprisoned . . . or both.
 18 U.S.C. S 1341.
 
 
 [5]
 A person who -(1) knowingly and fraudulently conceals . . . from creditors or the United States Trustee, any property belonging to the estate of a debtor; . . . (3) knowingly and fraudulently makes a false declaration, certificate, verification, or statement under penalty of perjury . . . in or in relation to any case under title 11; . . . shall be fined under this title, imprisoned . . . or both.
 18 U.S.C. S 152.
 
 
 
 46
 KLEINFELD, Circuit Judge, concurring in part and dissenting in part:
 
 
 47
 I concur in all of the well considered majority opinion except for part C(1), inclusion of the children's trust money in the loss calculation.
 
 
 48
 The government's evidence showed that Lawrence looted his children's trust. That is a bad thing to do, and it may have been criminal. But even if he stole his children's money, that did not make what was left of it his creditors' money. Yet treating the children's trust as a concealed asset, including it as part of the loss, and requiring restitution to creditors for it, has that effect. Possibly Lawrence's sentence should have been increased on account of his wrong to his children in using their money as his own. That wrong may be relevant conduct for purposes of sentencing. But it was not increased on that theory. It was increased on the theory that what was in the children's trust was actually Lawrence's money, and that he hid this money from his creditors by not listing it. That theory was not supported by the record. The children's trust should not have been counted as among the assets concealed from Lawrence's creditors.
 
 
 49
 Lawrence was, in my view, entitled to judgment of acquittal on the charges of concealment of assets under 18 U.S.C. S 152, insofar as this related to his trust for his children. The jury did not convict him on this charge, but the conduct charged was used as a basis for sentence enhancement. In order to commit the crime, a person must fraudulently conceal "property belonging to the estate of the debtor. " Lawrence appears from the recordto have looted the children's trust. He was freely borrowing from it and having bills paid by it as though the assets belonged to him. But however wrongful his (and perhaps the trustees') conduct may have been, the wrong was against the children, not against Lawrence's creditors. Taking some of the children's money to pay some creditors did not make the rest of the money Lawrence's, subject to the claims of his other creditors.
 
 
 50
 The record shows a valid trust. Lawrence established it in 1979, apparently as part of a divorce arrangement and prior to his financial difficulties during the mid-80's real estate collapse. He made a friend and his ex-wife the trustees, and conveyed substantial amounts to the trustees irrevocably, for the benefit of his children. The children were to get the money after reaching majority. The trustees were expressly prohibited in the trust instrument from exercising their powers for the benefit of Lawrence rather than his children. Thus the trustees had legal title, the children the beneficial interest. Lawrence retained no interest whatsoever. The trust assets were simply not "property belonging to the debtor."
 
 
 51
 That Lawrence used the children's money as his own, and that the trustees let him get away with it, did not make it his own. It is as though a crooked bank employee used some depositor's account as though it were his own; were the crooked bank employee to file for bankruptcy, he could not list the remaining funds in the depositor's account as his asset, and his creditors would not be entitled to what was left in the depositor's account. A thief does not get title to what he steals from his victim, nor to what his victim has left. In this case, treatment of the remaining money in the children's trust as Lawrence's assets is analogous to treating the thief as having title to what his victim has left after the theft. The money belongs to Lawrence's children, not his creditors.
 
 
 52
 The majority suggests that the conveyance to the trust was void under state law. I agree that state law controls, so that if state law nullifies the conveyance to the trust, then counting the trust assets as Lawrence's would be correct. But the majority's reading of state law is mistaken.
 
 
 53
 The majority's statutory citation, Alaska Stat.SS 34.40.110, 34.40.010, is to the Alaska Fraudulent Conveyance Act. This statute is a codification of the law of fraudulent conveyances. Since the Statute of Fraudulent Conveyances in 1571 criminalized conveyances made with the purpose and intent "to delay hinder or defraud" creditors or purchasers, creditors have been protected against such conveyances. The law of fraudulent conveyances enables a creditor to execute against assets that the debtor has fraudulently conveyed to another, as though the conveyance had not occurred. It protects creditors against conveyances intended to cheat them (not other people) out of their money. But there is no basis in the record for us to say that Lawrence's 1979 conveyance was intended to defraud, hinder or delay his creditors in his 1991 bankruptcy, which took place twelve years later. The indictment says his criminal scheme started in 1987, eight years after the conveyance into the trust for his children. The trust for his children has all the earmarks of his divorcing wife locking up some of Lawrence's money for his children while he was rich, and few or none of the usual badges of fraud.
 
 
 54
 The district court did not make any finding of fact that Lawrence's conveyance to the trust was a fraudulent conveyance. It did not find that Lawrence was insolvent when he conveyed the assets into the trust, that Lawrence retained possession of the assets conveyed into the trust, or that the conveyance into the trust was otherwise tainted by any of the traditional badges of fraud.
 
 
 55
 Blumenstein v. Alaska Insurance Center,Inc.,[1] Alaska's leading case on fraudulent conveyances, establishes that the intent element for fraudulent conveyances in Alaska demands actual rather than constructive intent when the conveyance is made. The existence of fraudulent intent in conveying the property to defraud creditors is a question of fact, and even where delivery and possession is never transferred (the record in this case seems to indicate that the trust assets were delivered to the trustees), so that a statutory presumption of fraud operates, the presumption is rebuttable by evidence showing that the conveyance, when made, was in good faith.[2]
 
 
 56
 Summers v. Hagen[3] establishes that to take the property from Lawrence's children's trust, his creditors would have to establish a "fraudulent scheme" under the Alaska Fraudulent Conveyances Act. That would require proof of (1)"An unlawful agreement," (2) "The specific intent of each participant in the scheme to hinder, delay and defraud a creditor of one who participated in the scheme," (3) "Acts committed pursuant to the unlawful agreement," and (4)"Damages caused by the acts committed pursuant to the unlawful agreement."[4] First National Bank v. Enzler[5] upholds a finding that a conveyance was not fraudulent, even though the debtor conveyed substantially all his assets to his wife and left himself insolvent, because some of the other "badges of fraud" (enumerated in the opinion were absent, and a court could conclude that the debtor did not intend the conveyance to defraud the creditor who sued to set it aside.
 
 
 57
 Lawrence's invasion of his children's trust may have been fraudulent as to the children. But that does not make the conveyance into the trust, in 1979, long before Lawrence's financial troubles and his fraudulent scheme started, a "fraudulent conveyance." There was no finding of fact by the district court that the 1979 conveyance into the trust was a fraudulent conveyance. It is plausible that the conveyance might have been intended to hide or shield assets from present or future creditors. It is perhaps more plausible that Lawrence established the trust when he was making plenty of money, with no intent to defraud his creditors (so no fraudulent conveyance), in order to shift income to his children who were presumably in a lower tax bracket, and in order to assure the children's mother that the children would be protected from whatever future financial events might affect Lawrence. Lawrence's abuse of the trust (not that it bears on whether the conveyance to the trust was fraudulent) may well have been, not an attempt to defraud his creditors, but rather a fraud on his children to misappropriate his children's money to pay some of his creditors.
 
 
 58
 There are no findings of fact that Lawrence made a fraudulent conveyance into the trust. Nothing in the record justifies us in finding as a matter of fact, on appeal, that he did. By its dependence on the Alaska Fraudulent Conveyances Act to count the children's trust money as part of Lawrence's assets, the majority implicitly concedes that unless the conveyance to the trust was void, the assets could not be counted. The majority apparently concludes that if the grantor loots an irrevocable trust, then its assets are his assets because of the fraudulent conveyance act. That is mistaken. The trustee has legal title, the beneficiaries equitable title, and the grantor no title. Were there a fraudulent conveyance, the grantor's creditors could take from the beneficiaries the assets of a trust that the grantor had partially looted. The doctrine of fraudulent conveyanceshas never, to my knowledge, been used that way. Were that the law, an ERISA plan of a failed business might be claimed by the businesses' creditors instead of being reserved for the employees, if the business looted the plan as it tried to stave off failure. What is left of the trust is the children's money, and they would not lose title to Lawrence's creditors even if Lawrence connived with the trustees to funnel it out. Without a finding of fact that the conveyance to the trust in 1979 was fraudulent, the money in the trust simply was not Lawrence's, so he could not properly be punished for failing to list it as his own on his bankruptcy papers.
 
 
 
 Notes:
 
 
 [1]
 Blumenstein v. Phillips Insurance Center, Inc., 490 P.2d 1213 (Alaska 1971).
 
 
 [2]
 Id. at 1218-19.
 
 
 [3]
 Summers v. Hagen, 852 P.2d 1165 (Alaska 1993).
 
 
 [4]
 Id. at 1169-70.
 
 
 [5]
 First National Bank v. Enzler , 537 P.2d 517 (Alaska 1975).