**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Fatima PEYTON, Defendant–**
**Appellant.**

No. 02–50482.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 8, 2003.

Filed Dec. 31, 2003.

Angela M. Krueger, Federal Defenders of San Diego, San Diego, CA, for the defendant-appellant.

Carol C. Lam, United States Attorney, Steve Miller, Assistant United States Attorney, United States Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before NOONAN, TALLMAN, and RAWLINSON, Circuit Judges.

Opinion by Judge TALLMAN; Dissent by Judge NOONAN.

TALLMAN, Circuit Judge:

Fatima Peyton was tried and convicted of access device fraud in violation of 18 U.S.C. § 1029(a)(1) and (2) and sentenced to 15 months imprisonment for her role in an identity theft ring. Following a successful appeal, in which we reversed six of the eight counts of conviction, Peyton was resentenced to 30 months. She now appeals the resentencing, asserting that: (1) the district judge acted vindictively by doubling her sentence; (2) the district court applied an improper evidentiary standard to evidence proffered in support of sentencing factors; and (3) insufficient evidence existed to apply the sentencing enhancements for accountable loss, obstruction of justice, and abuse of a position of trust.

We hold that the sentencing record does not rebut the presumption that the district judge acted in a vindictive manner by applying the obstruction of justice enhancement on resentencing after considering, but rejecting, this enhancement at the original sentencing. Accordingly, we vacate that part of Peyton's sentence and remand again for resentencing without it. We affirm the district court's rulings on all other claims.

I. Factual and Procedural History

The grand jury charged Peyton with falsely procuring American Express credit cards in the names of her fellow postal workers in order "to obtain money, goods, services, or any other thing of value." 18 U.S.C. § 1029(e)(1). Counts one through three generally alleged that Peyton fraudulently used three credit cards to obtain goods. Count one alleged a loss of $9,006.17; count two alleged a loss of $3,325.72; and count three alleged a loss of $6,504.17. Counts four through nine alleged specific instances of fraudulent credit card use. Before trial, the government dismissed count seven.

Peyton was arrested by U.S. Postal Inspectors on May 19, 2000, and was tried by a jury. Michael Lucas, her boyfriend, was charged as a co-defendant.[1] The evidence established that in 1999 Peyton worked as a supervisor for the United States Postal Service in San Diego. Like other supervisors, Peyton had access to the names and social security numbers of fellow employees working at her facility. During this time, David Lucas, Michael's brother, served as an administrative assistant with the United States Navy. David's position gave him access to naval personnel information.

Between July 19, 1999, and September 21, 1999, the names and social security

---

1. Lucas pled guilty on July 26, 2000, to the eight remaining counts and was sentenced to 15 months in custody.

numbers of six naval officers were used to apply for American Express credit cards that were to be delivered to the residence shared by Peyton and Michael Lucas. Eleven other credit card applications were made over the phone, each specifying David Lucas' separate address as the applicant's residence, most of which used the names and social security numbers of the Postal Service employees who worked in Peyton's office. On September 21, 2000, a jury found Peyton guilty on all eight counts of access device fraud for an accountable loss that was greater than $12,000.[2]

## A. The First Sentencing

The Presentence Report (PSR) recounted key facts connecting Peyton and Michael Lucas to the fraudulent credit card scheme. Peyton purchased tires at a San Diego Discount Tire store using one of the fraudulent postal employee cards. The salesman identified Peyton as the purchaser, the signature on the sales receipt matched Peyton's handwriting, and the tires were found on Peyton's car. A surveillance tape captured Peyton using the same card to purchase and install stereo equipment in her car at a Circuit City store. The installation order was placed by a person identified as "Fatima," and the equipment and receipt were found in Peyton's car. In addition, Peyton was with Michael Lucas when he used fraudulent cards to purchase gasoline for her car and bedding at Mattress Discounters.

On December 18, 2000, the district court sentenced Peyton. Although the indictment alleged that Peyton had fraudulently charged a total of $18,836.06, the PSR recommended a five-level upward adjustment for an accountable loss of $67,355.57, which American Express reported as the total purchases credited to all of the counterfeit credit cards obtained by the ring. The government argued that the total loss of $67,355 was attributable to Peyton as relevant conduct because she was involved in the overall scheme to defraud, and the entire amount of the loss was directly foreseeable by her. Peyton objected that the government failed to prove her connection to the entire $67,355 loss.

The PSR also recommended three sentencing enhancements: a two-level increase for more than minimal planning under U.S.S.G. § 2F1.1(b)(2)(A) and (B); a two-level increase for abuse of a position of trust under § 3B1.3; and a two-level increase for obstruction of justice under § 3C1.1. Peyton objected to the enhancements and requested downward adjustments and departures, including a minor role reduction under § 3B1.2(b).

The district court held Peyton accountable for $17,800 based on the allegations contained in the indictment, and accordingly increased her base offense score by only three levels.[3] At the first sentencing, the district court expressed reluctance to use the $67,355 figure due to its concern that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), required the government to prove the accountable loss beyond a reasonable doubt.

The district court applied a two-level enhancement for more than minimal planning and a two-level enhancement for abuse of a position of trust, but declined to apply a two-level enhancement for obstruc-

---

**2.** In a special finding regarding the amount of fraud attributable to Peyton, the jury found that she was responsible for more than $5,000 on count one, $2,000 or less on count two, and more than $5,000 on count three.

**3.** The jury verdict shows general estimates of the loss associated with the counts of conviction amounting to approximately $12,000. However, either amount would have triggered a three-level enhancement under U.S.S.G. § 2F1.1(b)(1)(D) (1998).

tion of justice. During trial, Peyton had offered Michael Lucas' declaration, which falsely attempted to exculpate Peyton of all misconduct. The district court ruled that Peyton could not be held responsible for a third-party's false declaration. It also denied the downward departure requested by Peyton. Peyton was sentenced to 15 months in custody and three years of supervised release.

### B. The First Appeal

On her first appeal, we vacated Peyton's convictions on six counts (counts one, two, four, five, six, and eight) due to a material variance in proof, but affirmed her convictions on counts three and nine. *United States v. Peyton*, 28 Fed.Appx. 655 (9th Cir.2002). The panel ordered a general remand for resentencing under *United States v. Ponce*, 51 F.3d 820 (9th Cir.1995). The panel did not address the other sentencing issues presented in the appeal or the government's cross-appeal.

### C. The Second Sentencing

At the resentencing on September 9, 2002, the district court applied a two-level enhancement for more than minimal planning and a two-level enhancement for abuse of a position of trust, but denied Peyton's request for a minor role downward departure. No longer concerned with the application of *Apprendi* because of intervening circuit authority, the district court applied the preponderance of the evidence standard and determined that there was sufficient evidence to attribute the entire loss of $67,355 to Peyton.

But the district court changed its prior ruling and found that Peyton had obstructed justice by submitting Lucas' false exculpatory declaration and applied the two-level enhancement. Although the district court stated that the obstruction enhancement applied because Peyton had improperly sought to influence the proceedings against her, it failed to provide an explana-

tion as to why the enhancement was appropriate now but had not been appropriate at the first sentencing hearing. The district court then resentenced Peyton to 30 months, double the original sentence, with credit for time served.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II. Vindictiveness

Peyton contends that the district court's imposition of a higher sentence at resentencing was vindictive, and therefore, a violation of her due process rights. We review de novo Peyton's constitutional challenges to her doubled sentence. *United States v. Mezas de Jesus*, 217 F.3d 638, 642 (9th Cir.2000).

■ Peyton has a Fifth Amendment due process right not to be subjected to vindictive resentencing after successfully attacking her conviction and sentence. *See Nulph v. Cook*, 333 F.3d 1052, 1057 (9th Cir.2003). To assure the absence of vindictiveness, the Supreme Court has concluded that "whenever a judge imposes a more severe sentence upon a defendant after a new trial, the reasons for his doing so must affirmatively appear." *North Carolina v. Pearce*, 395 U.S. 711, 726, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *see also United States v. Garcia–Guizar*, 234 F.3d 483, 489 (9th Cir.2000) (holding that the *Pearce* presumption applies to resentencings as well as retrials).

■ If the district court does not explain the reasons for the increase, "a presumption arises that a greater sentence has been imposed for a vindictive purpose—a presumption that must be rebutted by objective information ... justifying the increased sentence." *Garcia–Guizar*, 234 F.3d at 489 (citing *Alabama v. Smith*, 490 U.S. 794, 798–99, 109 S.Ct. 2201, 104

L.Ed.2d 865 (1989)). However, the presumption of vindictiveness applies only in those cases where "there is a 'reasonable likelihood' that the increase in sentence is the product of actual vindictiveness on the part of the sentencing authority." *Id.* (citation omitted). When a presumption of vindictiveness arises, the government may rebut it by providing reasons for the increased sentence using objective information. *See Nulph,* 333 F.3d at 1058–59. If the presumption does not apply, the defendant has the burden to prove actual vindictiveness. *Garcia–Guizar,* 234 F.3d at 489.

### A. The Accountable Loss Enhancement

■ The increase in accountable loss resulted solely from the district court's correction of its misunderstanding of the applicability of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The record reflects that the district court's initial reluctance to attribute the entire loss of $67,355 to Peyton was due to its understandable confusion over the role of the jury in determining relevant conduct.[4] At the initial sentencing hearing, there was a lengthy discussion regarding the scope and impact of *Apprendi* on relevant conduct for sentencing purposes, during which the district court stated:

> [I]t seems to me that the *Aprendi* [sic] case has impacted the preexisting concept of relevant conduct ... I just—feel that what *Aprendi* [sic] is telling me is that they don't want judges enhancing sentences with evidence that was never heard by the jury and was not found to be true beyond a reasonable doubt. They don't want judges considering declarations, offers of proof by counsel, court records and whatever, things that

were not seen by the jury to enhance a sentence which would have been there had the sentence been based upon evidence which was heard and considered by the jury. That's what I think *Aprendi* [sic] is telling me ... I don't feel like going beyond what I think *Aprendi* [sic] tells me.

The government challenged the district court's understanding of *Apprendi* by arguing that it applied only to sentences that went beyond the statutory maximum. The district court replied that "[it wasn't] so sure the Court limited their language.... [T]he language is quite broad in *Aprendi* [sic]."

During the resentencing, the district court referred to its prior confusion by specifically noting that it was previously "concerned whether finding relevant conduct based upon conduct of the defendant, which [it] was satisfied had been shown by a preponderance of the evidence but which [was] not embraced in a count of conviction ... might offend *Aprendi* [sic]." The district court then stated:

> [T]he Court's *present* understanding of the *Aprendi* [sic] case is that the decisions that the Court has made in finding the various adjustments, not all of which are based upon convictions but some of which are based upon investigations in the file and which can be supported ... by a preponderance of the evidence, the Court finds that a preponderance of the evidence has been shown to justify all of the adjustments .... (emphasis added).

Because the district court's reasons for attributing a greater amount of loss to Peyton affirmatively appear in the record, no presumption of vindictiveness exists.

---

**4.** *Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490, 120 S.Ct. 2348. The district

court may not have been aware of our subsequent decision in *United States v. Hernandez–Guardado,* 228 F.3d 1017 (9th Cir.2000), that settled the uncertainty. *Id.* at 1026–27.

*See Garcia–Guizar,* 234 F.3d at 490 (holding that the *Pearce* presumption does not apply where the record affirmatively shows that a harsher sentence was due to a correction of a prior sentencing error).

Peyton argues, and the Dissent agrees, that the district court expressed an alternative basis for not attributing the total amount of loss to Peyton during the initial sentencing proceeding. During that hearing, the district court stated:

> Another reason why I'm reluctant to use the 67,000 is that I never really did see much quantification, in terms of specific identification of amounts, charges, receipts, credits, purchases.... And I've never thoroughly been briefed on exactly what all that quantifies to. It's just a very short summary by the Probation Department. No doubt they've got material in their file, but I've never been made privy to any of it. And I don't feel that ... the Court could enhance beyond what the jury saw, and I'm not willing to concede that right now, I don't feel sufficiently apprised as to what that all amounts to. And so, I'm not going to go that route.

Examining the entire record, we find that this individual statement, in light of the numerous statements that the district court made regarding its confusion about *Apprendi* during both sentencing proceedings, does not constitute an alternative and independent ground for declining to attribute the entire amount of accountable loss to Peyton.[5] In the above quoted passage, the district court made yet another reference to its mistaken understanding of *Apprendi,* stating that it did not think that it could enhance beyond what the jury saw. Further, at resentencing, the district court

stated that it was satisfied that the "relevant conduct based upon conduct of the defendant ... had been shown by a preponderance of the evidence." Whatever doubts the challenged statement raised are assuaged by the evidence showing the court's confusion over *Apprendi* in the initial sentencing proceedings. Because the valuation issue was not an independent basis for the district court's initial decision, the attribution of $67,355 in accountable loss at resentencing does not amount to actual vindictiveness or even a reasonable likelihood of actual vindictiveness. We ordered a general remand for resentencing; thus, the district court was free to reexamine the relevant conduct issue anew.

Because the presumption does not apply, Peyton retains the burden to prove actual vindictiveness. *Garcia–Guizar,* 234 F.3d at 489. Peyton has failed to carry her burden.

### B. The Obstruction of Justice Enhancement

■ In contrast, the district court failed to provide its reasons for applying the obstruction enhancement at resentencing. During the first sentencing, the district court did not apply the enhancement because it felt Peyton's attempt to introduce Lucas' declaration of her innocence was similar to an "exculpatory no" by the defendant.[6] Based on the same set of facts presented at resentencing, the district court found that Peyton's proffer of a declaration she knew to be false amounted to an obstruction of justice. Absent any explanation of the district court's contradictory interpretation of the same evidence, it is reasonably likely that the two-level enhancement was the product of actual vin-

---

5. The lengthy exchange regarding the *Apprendi* issue spans eighteen pages of the initial sentencing record. The only reference the sentencing court made to the valuation issue was the statement cited above.

6. The district court explained that an "exculpatory no" was traditionally not considered to be obstruction of justice.

dictiveness. Therefore, the *Pearce* presumption applies. *See Smith,* 490 U.S. at 799, 109 S.Ct. 2201.

The government failed to rebut the presumption that this harsher sentence was in retaliation for Peyton's successful appeal. The Government did not present any facts to show why, on remand, the court found the enhancement to be appropriate when it previously had found that this affidavit was not traditionally the type considered to be an obstruction of justice. Accordingly, we reverse the application of the obstruction enhancement, vacate that part of Peyton's sentence, and remand for resentencing without it.

### III. Evidentiary Standard

■ Because Peyton failed to object to the evidentiary standard applied to the relevant conduct assessment at resentencing, we review her challenge for plain error. *See United States v. Jordan,* 256 F.3d 922, 926 (9th Cir.2001). Peyton must show that the application of the preponderance of the evidence standard was "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* (citation omitted).

■ The application of the preponderance of the evidence standard, as opposed to the clear and convincing standard, violated Peyton's due process rights only if it led to enhancements that had an "extremely disproportionate effect on the sentence relative to the offense of conviction." *United States v. Mezas de Jesus,* 217 F.3d 638, 642 (9th Cir.2000) (citing *McMillan v. Pennsylvania,* 477 U.S. 79, 87–91, 106

S.Ct. 2411, 91 L.Ed.2d 67 (1986)). Under the disproportionate impact test, we examine the "totality of the circumstances" using the following factors:

[1] Does the enhanced sentence fall within the maximum sentence for the crime alleged in the indictment?

[2] Does the enhanced sentence negate the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment?

[3] Do the facts offered in support of the enhancement create new offenses requiring separate punishment?

[4] Is the increase in sentence based on the extent of a conspiracy?

[5] Is the increase in the number of offense levels less than or equal to four?

[6] Is the length of the enhanced sentence more than double the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence?

*United States v. Valensia,* 222 F.3d 1173, 1182 (9th Cir.2000) (citations and footnote omitted), *vacated by* 532 U.S. 901, 121 S.Ct. 1222, 149 L.Ed.2d 133 (2001); *see also Jordan,* 256 F.3d at 928.[7]

The first four factors of the disproportionate impact test are undisputed and inapplicable. Because only a three-level enhancement is in dispute, the fifth factor does not compel the application of the clear and convincing evidence standard.[8]

---

7. The government argues that our cases are in conflict as to when the clear and convincing evidence standard is required and urges us to make a sua sponte en banc call. While we acknowledge that our case law has not been a model of clarity, the disproportionate impact test is now settled law in the Ninth Circuit. *See Jordan,* 256 F.3d at 928; *see also Valensia,* 222 F.3d at 1182.

8. In her appeal, Peyton challenges the five-level increase for accountable loss and the two-level increase for obstruction of justice. However, because the jury determined that the amount of attributable loss for count three was proven beyond a reasonable doubt, which translated into a two-level upward adjustment, Peyton may challenge only the additional three levels applied for accountable loss. Further, we will not consider the two-

Finally, the sixth factor does not support the use of the more stringent standard because the enhancement did not cause Peyton's sentencing range to double. The increase was from 12–18 months to 21–27 months, which is not extremely disproportionate.

Because the application of the preponderance of the evidence standard does not result in an extremely disproportionate sentence, the district court did not err by applying the lower standard of proof when determining if the enhancements were appropriate. Thus, we need not address the remaining factors of the plain error test.

**IV. The Accountable Loss Enhancement**

█ Peyton claims that the district court erred by imposing a five-level enhancement under U.S.S.G. § 2F1.1(b)(1)(F) because the government failed to provide sufficient evidence to prove that the $67,355 loss was relevant conduct attributable to her. We review for clear error the district court's determination of the amount of loss attributable to a defendant for sentencing. *United States v. Lawrence,* 189 F.3d 838, 844 (9th Cir. 1999). We find no such error.

█ When determining relevant conduct, the district court properly considered charged, uncharged, and acquitted conduct by the defendant. *See United States v. Munoz,* 233 F.3d 1117, 1127 (9th Cir.2000); *see also United States v. Watts,* 519 U.S. 148, 156–57, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (permitting the district court to consider "acquitted conduct" as relevant conduct). Relevant conduct is the sum of two figures: (1) the amount of loss that resulted from the acts "committed, aided,

abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," U.S.S.G. § 1B1.3(a)(1)(A); and (2) "all reasonably *foreseeable* acts and omissions of others *in furtherance* of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added).

Under U.S.S.G. § 1B1.3(a)(1)(A), the district court did not err by attributing $8,618.11 of loss to Peyton.[9] Enough evidence existed for the district court to find that Peyton personally and willfully used the fraudulently-obtained credit cards to purchase items for that amount. Fraudulently-obtained merchandise and receipts were found in Peyton's possession, her handwriting matched the signatures on the receipts, and video surveillance showed Peyton and Lucas making purchases with the cards.

█ Moreover, because a common scheme to defraud existed, the conduct of Peyton's co-conspirators in the identity theft ring can be considered relevant conduct for purposes of her sentencing. "Each conspirator is responsible only for the activities that [fall] within the scope of his particular agreement with the conspirators, and reasonably foreseeable behavior in furtherance of that particular agreement." *United States v. Riley,* 335 F.3d 919, 928 (9th Cir.2003) (citation omitted). When determining the scope of the criminal activity that Peyton agreed to jointly undertake, the district court properly considered the explicit or implicit agreements that could fairly be inferred from the conduct of Peyton and her co-conspirators. *See* U.S.S.G. § 1B1.3 cmt. 2.

Here, the purpose of this criminal scheme was identity theft with intent to

---

level enhancement for obstruction because we have now reversed it due to vindictiveness. *See* Part II.B.

9. This is the total amount of the loss that was found attributable to Peyton under count

three by the jury plus the total amount of purchases that were listed in the PSR as being made directly by Peyton, less any overlapping charges.

defraud. The scope of the scheme included the fraudulent acquisition and use of at least 17 credit cards by six co-conspirators.[10] The record shows that Peyton used her supervisory position to obtain and provide personal information of at least eight postal employees. She obtained credit cards in the names of these postal employees that were sent to David Lucas' residence, which she could not have obtained had she not conspired with Michael and David Lucas. Further, the district court properly inferred that Peyton was aware of the fraudulently-obtained naval employee credit cards because they were sent to her home address and were conspicuously issued in other people's names. Moreover, the PSR contained statements made by Michael Lucas connecting the other co-conspirators with the overall scheme. Michael Lucas indicated that he was "surprised [that] Peyton did not tell agents about . . . David Lucas' involvement in the credit card scheme."

Sufficient evidence existed to support a finding that Peyton participated in and had knowledge of the full scope of the criminal scheme and that she could reasonably foresee that her co-conspirators would illegally procure property and services in furtherance of that identity theft scheme. Thus, the district court did not clearly err by finding that the entire $67,355 loss was attributable to Peyton.[11]

## V. The Abuse of a Position of Trust Enhancement

■ Peyton challenges the two-level enhancement for abuse of a position of trust. The application of this enhancement is a mixed question of fact and law that we review de novo. *United States v. Brickey*, 289 F.3d 1144, 1153 (9th Cir. 2002).

■ A defendant's offense level may be increased by two levels "if the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Peyton was in a "position of public or private trust" if she had "professional or managerial discretion . . . [and was] subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.* at cmt. 1. We consider the following factors to determine whether Peyton held a position of trust: (1) "the inability of the trustor objectively and expediently to determine the trustee's honesty;" and (2) "the ease with which the trus-

10. Michael Lucas identified five other co-conspirators to the scheme: Peyton, David Lucas, Dale Wilson, Lydia Wilson, and Omar Verges.

11. Peyton contends that the entire $67,355 loss cannot be attributed to her because the government failed to explain how it calculated this amount. However, "[t]he district court's valuation 'need not be determined with precision.' U.S.S.G. § 2F1.1, comment. (n.8). The court need only make a reasonable estimate of the loss, given the available information.' " *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir.1999) (quoting *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir.1990)).

In this case, the Sentencing Summary of the PSR specifically states:

 USSG § 2F1.1(b)(1) provides for specific offense level increases if the monetary loss exceeded $2,000. Although the Indictment in this case specifies a loss of $18,836.06, based on conversations with representatives of the victim, (American Express), their records indicate the *actual* loss to be $67,355.57. This figure represents the total amount of purchases credited to the counterfeit devices used by both defendants as there were other identifiable victims who accrued losses that [Michael Lucas] made mention of during his post-arrest statements.

The information contained in the PSR indicates that the $67,355.57 figure was based on more than a reasonable estimate. The district court did not err by adopting the actual loss totaled by American Express.

tee's activities can be observed." *United States v. Hill,* 915 F.2d 502, 506 (9th Cir. 1990).

 As a supervisor with the U.S. Postal Service, Peyton was subject to significantly less supervision than the regular postal employees. She possessed managerial discretion to access a secured roster listing the names and social security numbers of postal employees so that she could authorize over-time. Peyton's position allowed her to use the personal information of her fellow postal employees to commit fraud in their names without being easily detected or observed. As such, Peyton occupied a position of trust with respect to the postal employees under § 3B1.3.

 Peyton's argument that the enhancement was improper because she did not hold a position of trust with American Express—the only "victim"—is unpersuasive. A position of trust under § 3B1.3 must be examined from the victim's perspective. *Id.* at 506, n. 3. Contrary to Peyton's assertion, victims of fraud are not limited to the entities that bear the ultimate financial burden, but also include those who bear "emotional, financial and other burdens." *United States v. Akinkoye,* 185 F.3d 192, 203–04 (4th Cir.1999) (holding that in credit card fraud, the people involved are victims as well as the credit card companies, even though the individuals are not directly responsible for the fraudulent charges). Peyton's actions injured those people named on the credit cards because their credit histories were adversely affected. Accordingly, the victims to this fraud were both American Express and the targeted postal and naval employees. The district court did not err by applying the enhancement for abuse of Peyton's position of trust.

## VI. Reassignment

 Peyton requests that this case be reassigned upon remand. A remand to a different district judge is appropriate if there is "a demonstration of personal bias or in unusual circumstances." *Smith v. Mulvaney,* 827 F.2d 558, 562 (9th Cir.1987) (internal quotations and citations omitted). To determine whether unusual circumstances are present, we consider the following factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* at 562–63 (citation omitted). A finding of either one of the first two factors supports remanding the resentencing to a different judge. *California v. Montrose Chem. Corp. of California,* 104 F.3d 1507, 1521 (9th Cir.1997).

 The finding of vindictiveness does not, in itself, require us to remand to a different judge where there is no evidence of personal bias or a showing that the judge "would not be able to put out of his mind his previously expressed views or that he would ignore the mandate of this court on remand." *United States v. Rapal,* 146 F.3d 661, 666 (9th Cir.1998) (citation omitted) (holding that a judge acted vindictively by imposing a harsher sentence, but finding no evidence in the record of any bias towards the defendant). Because we find no such indication here, we decline to reassign this case to a different district judge. We are confident he will conscientiously discharge his sentencing duties in conformance with our mandate.

## VII. Conclusion

We affirm the district court's computation of the accountable loss under relevant conduct and its application of the two-level enhancement for abuse of a position of trust. We reverse the enhancement for obstruction of justice and vacate only that part of the sentence imposed. Accordingly, we remand for resentencing consistent with this opinion.

**AFFIRMED in part; REVERSED in part; sentence VACATED and REMANDED.**

NOONAN, Circuit Judge, dissenting:

On remand to the district court after a successful appeal to this court, the district court doubled Peyton's sentence. In disregard of the Supreme Court and our own circuit precedent, the court sustains a portion of this presumptively vindictive sentence.

Applying *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) and *Wasman v. United States*, 468 U.S. 559, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984), we recently stated:

> We have held that no reasonable likelihood of vindictiveness exists unless there is some "triggering event," such as a reversal and remand. *Bono v. Benov*, 197 F.3d 409, 417–18 (9th Cir.1999).
>
> When the *Pearce* presumption applies, it is rebutted only by "objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." 395 U.S. at 726, 89 S.Ct. 2072, 23 L.Ed.2d 656; *see also Wasman v. United States*, 468 U.S. 559, 565, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984) (holding that the reasons must be based on "objective information in the record justifying the increased sentence"). The State bears the burden of rebutting the

presumption. *Wasman*, 468 U.S. at 569, 104 S.Ct. 3217, 82 L.Ed.2d 424. If it fails to do so, we may vacate the sentence and grant habeas relief. *See Pearce*, 395 U.S. at 726, 89 S.Ct. 2072, 23 L.Ed.2d 656.

*Nulph v. Cook*, 333 F.3d 1052, 1057–58 (9th Cir.2003).

If *Pearce* is the law governing a habeas petition challenging a state sentence, it is a fortiori the law governing federal sentencing. See *Wasman*, 468 U.S. at 564–65, 569, 104 S.Ct. 3217. *Pearce* requires identifiable conduct by the defendant after the time of the original sentencing. No identifiable conduct by Fatima Peyton has occurred since her first sentencing. Therefore under *Pearce* the district court has acted vindictively. No more need be said.

The *Apprendi* confusion of the district judge has disappeared. This court claims that the *Apprendi* confusion was the only reason for his first sentence bearing on the loss. But, in the very passage quoted in the majority opinion, the judge said, "*Another reason* why" and went on to say in so many words, "I never really did see much quantification.... I've never been made privy to any of it." Contrary to the majority opinion, the district court distinguished the *Apprendi* reason and the evidence before him. In the passage quoted, he addressed the United States Attorney, "And I don't feel that ... even if you're right that the Court could enhance beyond what the jury saw, ... I don't feel sufficiently apprised as to what that all amounts to. And so, I'm not going to go that route."

The government did not present new evidence as to the loss. Why did the district court find there was now a preponderance of evidence justifying the higher sentence on the second round? We have no idea. The presumption of vindictiveness applies.

The presumption arises when reasons for a harsher sentence after a successful

appeal do not affirmatively appear, unless there is no reasonable likelihood of vindictiveness. *Alabama v. Smith,* 490 U.S. 794, 798–99, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). We have gone beyond *Pearce* to permit resentencing to correct a mathematical error made by the probation officer. *United States v. Garcia–Guizar,* 234 F.3d 483 (9th Cir.2000). But in that case there was no presumption of vindictiveness. Here, the contrary is the case.

Not surprisingly, this court has found it reasonably likely that the district court acted with actual vindictiveness when it sentenced for obstruction of justice—a hard but true conclusion to reach about a federal court. How was the judge's vindictive frame of mind different when he sentenced on the basis of a higher loss? The district judge was engaged in a single sentencing session. He could scarcely have been a vindictive judge and an impartial judge in the same short space of time.

A British appellate judge was once reputed to discourage appeals by exercising his court's prerogative of increasing, even doubling, the sentences of appellants who lost their appeal. It was an effective tactic for reducing appeals. It was not a glory of British jurisprudence. In our case, appeal has been discouraged by the action of the district judge given a stamp of approval by this court. "Win your appeal and double your sentence." That cannot be our motto or that of any judicial body interested in doing justice. The motto is not any better if it reads: "Win your appeal and increase your sentence 40 percent."

The process due every defendant has been violated by the district court in violation of the Fifth Amendment. The decision of the district court requires reversal.